**H & H TIRE COMPANY, Petitioner,**

v.

**UNITED STATES DEPARTMENT OF TRANSPORTATION et al.,**
Respondents.

No. 71–1935.

United States Court of Appeals,
Seventh Circuit.

Argued April 5, 1972.

Decided Dec. 5, 1972.

Hammond E. Chaffetz, Fred H. Bartlit, Jr., and Tefft W. Smith, Kirkland & Ellis, etc., Chicago, Ill., for petitioner.

Alan S. Rosenthal, Thomas J. Press, Lawrence G. Schneider, Frank Berndt, Michael P. Peskoe, Attys., Dept. of Justice, Washington, D. C., for respondents.

Before PELL, STEVENS, and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

Petitioner H & H Tire Company, an independent tire retreader, seeks judicial review of Federal Motor Vehicle Safety Standard No. 117 (Standard 117)[1] issued by the Department of Transportation pursuant to the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. § 1381 et seq. Standard 117 establishes specified processing and performance requirements for retreaded pneumatic passenger tires.[2] On petitioner's motion, this court, pending its review, stayed the enforcement of the standard, scheduled to have become effective January 1, 1972.

The purpose of the 1966 Safety Act is "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents," 15 U.S.C. § 1381. Toward that end, Congress conferred upon the Secretary of the Department of Transportation the power to establish federal motor vehicle safety standards,[3] which are defined as "minimum standard[s] for motor vehicle performance, or motor vehicle equipment performance . . .," 15 U.S.C. § 1391(2). The Secretary in turn delegated this authority to respondent National Highway Traffic Safety Administration (Safety Administration). The Act requires compliance with the Administrative Procedure Act (the A.P.A.), 5 U.S.C. § 501 et seq.

When it was engaged in informal rulemaking procedures, 5 U.S.C. § 553, that resulted in the issuance of Standard 117, the Safety Administration received comments reflecting a difference of opinion about the kind of rule the Administration should adopt. Some interested parties preferred a performance standard which would test the performance of completed retreaded tires regardless of their method of manufacture. Others advocated a processing standard setting forth approved methods and processes by which tires should be retreaded. Those favoring performance standards maintained that retreaded tires could and should be expected to meet the same performance standards established for new tires. Standard 117 in its final form reflects this point of view and incorporates five laboratory performance tests that are part of the safety standard for new tires, Standard 109.[4]

In December 1971, after the Safety Administration failed to amend Standard 117 so as to obviate their objections to the inclusion of two of Standard 109's performance tests, H & H Tire Company, several other independent retreaders, and the American Retreaders' Association, Inc. instituted suit in the District Court for the Northern District of Illi-

---

1. 36 F.R. 7315 (April 17, 1971) (formal issuance). See also 32 F.R. 14278 (October 14, 1967) and 35 F.R. 4136 (March 5, 1970). For amendments unrelated to the petitioner's challenge here, see 36 F.R. 20877 (Oct. 30, 1971), 36 F.R. 22239 (Nov. 23, 1971) and 36 F.R. 24814 (Dec. 23, 1971).

2. Retreading involves the fusion, through vulcanization, of a new tread into a tire casing from which the prior tread has been worn through use. The manufacture of retreaded tires, an industry over fifty years old, accounts for approximately one of every four tires produced in the United States, or about fifty million tires annually. There are some 8500 retreaders, most of whom are small, independent operators.

3. "The Secretary shall establish by order appropriate Federal motor vehicle safety standards. Each such Federal motor vehicle safety standard shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms."
15 U.S.C. § 1392(a).

4. 36 F.R. 22914 (Dec. 2, 1971). See also 36 F.R. 23067 (Dec. 3, 1971).

nois to have Standard 117 declared invalid and its enforcement enjoined. A week later, the plaintiffs voluntarily dismissed the action, and H & H Tire Company filed the present petition for review.[5]

Petitioner here urges that Standard 117 must be set aside because it allegedly is in excess of statutory authority and was fashioned without observance of the procedures required by law. Petitioner's attack on the substantive validity of the standard centers on its incorporation of Standard 109's "high speed" and "endurance" tests, which were developed originally for new tires.[6] The issuance of Standard 117 was allegedly procedurally improper because the Safety Administration failed to provide the "concise general statement of [the standard's] basis and purpose" required by Section 4 of the A.P.A., 5 U.S.C. § 553.

I

The scope of our review is prescribed by Section 10 of the A.P.A., now 5 U.S.C. §§ 701–706.

"When the issue on appeal is whether a rule made in informal proceedings

[under A.P.A. § 4, 5 U.S.C. § 553] meets the criteria of Section 10, the court must necessarily go about the application of that standard in a manner unlike its review of findings of fact and conclusions of law compiled in a formal proceeding [A.P.A. §§ 7, 8, 5 U.S.C. §§ 556, 557].

"This exercise need be no less searching and strict in its weighing of whether the agency has performed in accordance with the Congressional purposes. . . . The paramount objective is to see whether the agency, given an essentially legislative task to perform, has carried it out in a manner calculated to negate the dangers of arbitrariness and irrationality in the formulation of rules for general application in the future." Automotive Parts & Accessories Ass'n, Inc. v. Boyd, 132 U.S.App.D.C. 200, 407 F.2d 330, 338 (1968).

If the requirements of Section 10 have not been satisfied, we must "hold unlawful and set aside [the] agency action. . . ." A.P.A. § 10(e), 5 U.S.C. § 706.[7]

---

5. The Safety Act, 15 U.S.C. § 1394(a), provides for direct review of federal motor vehicle safety standards by U. S. courts of appeals.

6. The two challenged laboratory performance tests are adopted in § 5.1.1(e) and § 5.1.1(f) of Standard 117. The tests run tires under stress on a 67-inch smooth steel laboratory wheel. In the high speed performance test, the tire is first run for a two hour break-in period at 50 m. p. h., then for ½ hour at 75 m. p. h., then ½ hour at 80 m. p. h., and finally for ½ hour at 85 m. p. h. At the conclusion of the test, the tire is not permitted to show signs of tread, ply, or bead separation, chunking, or broken cords. According to the Government, this test is designed to measure the tire's ability to perform at high temperatures. In the endurance test, a tire runs on the laboratory wheel for 34 continuous hours at a set rate of 50 m. p. h., with a weight load that is periodically increased until it is the equivalent of a 33% overload. This test is allegedly designed to gauge the ability of the tire to withstand loads for extended periods of time.

The other three tests that Standard 117 takes from Standard 109 are static tests measuring resistance to the unseating of the tire from the tire rim ("bead unseating" test), tire cord body strength ("breaking energy" test), and tire size.

7. 5 U.S.C. § 706 provides in part:
"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.
The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) *arbitrary, capricious, an abuse of discretion,* or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) *in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;*

The Safety Act provides that a proposed standard is to be "practicable," to "meet the need for motor vehicle safety," [8] to be based upon the consideration of relevant, available motor vehicle safety data,[9] and to be "reasonable, practicable and appropriate" for the particular item of motor vehicle equipment regulated, 15 U.S.C. §§ 1392, 1395. Petitioner H & H Tire contends that Standard 117 satisfies none of these mandatory criteria for a proposed motor vehicle safety regulation.

The House debate on its proposed safety bill suggests that by "practicable" the legislators meant that all relevant factors be considered by the agency, "in-cluding technological ability to achieve the goal of a particular standard as well as consideration of economic factors." 112 Cong.Rec. 19648 (Aug. 17, 1966). The Report of the Senate Commerce Committee recommending passage of the Senate's version of the safety act, which was the basis for the version ultimately enacted, stated: "The committee recognizes . . . that the Secretary will necessarily consider [in the issuance of standards] reasonableness of cost, feasibility and adequate lead time." 2 U.S. Code Cong. & Adm.News, 89th Cong., 2d Sess., 1966, p. 2714.

Petitioner refers us to evidence in the record [10] that production retread tires

---

(D) without observance of procedure required by law;

> .    .    .    .    .

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." [Emphasis added.]

8. The Act, defines "Motor vehicle safety" as follows:

"  .    .    .   the performance of motor vehicles or motor vehicle equipment in · such a manner that the public is protected against unreasonable risk of accidents occurring as a result of the design, construction or performance of motor vehicles and is also protected against unreasonable risk of death or injury to persons in the event accidents do occur, and includes nonoperational safety of such vehicles."
15 U.S.C. § 1391(1).

9. The Act requires the Safety Administration to "conduct research, testing, development, and training necessary to carry out the purposes of this subchapter. .    .    . " Among the activities authorized are:

"(1) collecting data from any source for the purpose of determining the relationship between motor vehicle or motor vehicle equipment performance characteristics and (A) accidents involving motor vehicles, and (B) the occurrence of death, or personal injury resulting from such accidents;
"(2) procuring  .    .    .  experimental and other motor vehicles or motor vehicle equipment for research and testing purposes. .    .    . "
15 U.S.C. § 1395(a)(1) and (2).

10. Before the briefs were filed, the petitioner moved this court to allow the administrative record to be supplemented by twelve additional exhibits: four are depositions of Safety Administration officials taken pursuant to the dismissed district court proceedings, two are public statements by the agency, and the rest consist mainly of affidavits embodying sworn statements of fact that the petitioner states were previously submitted to the Safety Administration in informal form. As this court ordered, the parties devoted part of their briefs to the propriety of including these additional materials.

Respondents concede that the additional material is, to a large extent, an elaboration of evidence previously submitted to the Safety Administration. To the extent that "new evidence" is involved, they contend that 15 U.S.C. § 1394(a)(2) controls. That section authorizes the court of appeals to remand a case to the agency for its consideration of new evidence where the petitioner has shown reasonable grounds for its failure to adduce the new evidence before the agency.

We have included the additional material in our review of the evidence in this case. We do not agree with respondents that the exhibits merely "encumber the record." Further, and this is particularly true of the depositions of officials of the Safety Administration, the material is not "new" in the sense of being unknown to the agency. To remand the case for consideration of these few exhibits at this juncture would create even further delay in the disposition of the controversy.

cannot comply with Standard 117. With one significant exception, tests by the tire industry revealed substantial rates of failure for retreads on the endurance and the high speed tests. The combined failure rates were 28% on the endurance test and 17% on the high speed test. Only the Tire Retreading Institute, a division of the National Tire Dealers and Retreaders Association, Inc., found that 100% of the tires it tested passed. As petitioner points out, however, the record does not establish whether the few tires tested by the Institute were randomly selected production retreads or were new tire casings simply buffed and retreaded. Although tests conducted by the Safety Administration apparently had varying results, the failure rates there were also not insignificant.

The Government points out that some retreaders have admitted they might be able to redesign their tires so that they would be more likely to pass the high speed and endurance laboratory tests.[11] We cannot agree that these statements prove that Standard 117 satisfies Congress's intent that a safety standard be both technologically and economically feasible. The respondents refer us to no analyses of the costs of such design changes nor to determinations of how long it would take the retreading industry to begin production of the redesigned retreads.

Standard 117 and the statute under which it was promulgated require every producer of retreaded tires to certify that each retreaded passenger tire it manufactures to sell or introduce into interstate commerce conforms to the standard. The Safety Act provides for a civil penalty of up to $1000 for each separate violation and a maximum penalty of $400,000 for any related series of violations. 15 U.S.C. §§ 1397, 1398. In light of the not negligible failure rate of retreads as presently designed on the two challenged tests and the possibility that the industry's best efforts might be insufficient to insure prompt compliance with Standard 117, the penalties established by the Act might have a considerable economic impact on the retreading industry.

■ These considerations, taken alone, do not conclusively establish that the issuance of Standard 117 violates Section 10 of the A.P.A. We agree with the Government that "the fact that a government regulation may cause economic hardship to a party does not make such regulation unreasonable." The deleterious economic effect on the industry of required compliance with Standard 117 might be permissible if retreads unquestionably were major safety hazards and if compliance with the standard clearly enhanced retreads' safety under on-the-road conditions. However, it appears to be a fair statement from the record that, except for excessive wear (bald or thin tires), tires in general, retreaded tires included, pose no significant safety problem.[12] Also, we have some doubts whether Standard 117 meets the need for motor vehicle safety as required by the authorizing statute. The purpose of the regulation was to provide the public with retreaded passenger car tires capable of performing safely under modern driving conditions,

---

11. We note that analyses in the record by some retreaders suggest that the redesigning of retreads to increase the likelihood of their passing the Standard 109 tests might not eliminate all failures. Petitioner alleges that a significant percentage of retreads would still fail the tests. And, according to at least one tire expert, a Firestone Tire & Rubber Company engineer, the design changes necessary to improve laboratory performance may degrade rather than promote the safety of retreads in actual highway use.

12. Cf. In the Senate Report accompanying the bill ultimately passed, the Commerce Committee declared: "The Secretary is not expected to issue a standard covering every component and function of a motor vehicle, but only for those vehicle characteristics that have a significant bearing on safety." 2 U.S.Code Cong. & Adm.News, 89th Cong., 2d Sess. 1966, p. 2714.

35 F.R. 4136, 36 F.R. 7315. The respondents can cite little evidence in the administrative record in support of their assertion that the challenged tests are appropriate to predict the safety of retreads in road performance—that is, "correlation"—and, thus, to achieve the valid goal announced by the Safety Administration. Indeed, studies by the Administration itself suggest the need for further research on the degree to which Standard 109's tests correlate with road testing results.

Thus, we cannot conclude from the record before us that the respondents adequately investigated the practicability of Standard 117 before issuing it. Rather, it appears that the Safety Administration minimized the importance of a close inquiry into the costs to the retreaders that Standard 117 would entail. It thereby adopted a rule which, if implemented now, might possibly destroy a well-established industry. The agency acted precipitately, without adequate study.

Furthermore, the respondents seem to overlook the fact that, if economic analyses were to show that retreaders would suffer severe economic hardship, either by being forced out of business or by being priced out of their market, the retreaders' customers would also suffer. As the Safety Administration stated in its March 5, 1970 notice of proposed rulemaking, "There is a large segment of the motoring public that relies on retreaded tires for use on passenger cars." 35 F.R. 4136. In their responses to the notice, some retreaders stated that purchasers of retreads are often persons who cannot afford new tires or who, because of the expense of new tires, continue to use worn out tires much longer than they, in safety, should. The Safety Act explicitly recognizes that tires may be new or retreaded, e. g., 15 U.S.C. § 1402(g), § 1421(1). This certainly militates against the idea that Congress intended to authorize the respondents to narrow the selection or alternatives available to consumers when they decide to buy automobile tires.

We also agree with the analysis contained in Judge Stevens's concurring opinion.

## II

As we analyze the respondents' position, its underlying structure is that the Safety Administration, pursuant to Congressional permission, utilized informal rulemaking procedures rather than the more formal adjudicatory processes and because the standard promulgated related to safety it was virtually unchallengeable. The availability of informal rulemaking procedures is not equatable with administrative fiat. There must be some assurance discernible that the administrative action was reasoned and based on a consideration of relevant factors. Nor is the action to be saved by the importance of the subject. We do not minimize the desirability of all reasonable and practicable steps for the diminution of highway carnage. That, of course, could be accomplished by the elimination of all privately owned automobiles. We do not understand that Congress had that in mind. Meeting the "need for motor vehicle safety" may be accomplished with much less and still be "reasonable, practicable and appropriate."

From our examination and analysis of the record, we hold that the Safety Administration, when promulgating Standard 117, failed to inquire adequately into certain important topics, thereby slighting statutorily-required considerations, and, further, failed to evaluate reasonably the relevant, available data. *Cf.* Shannon v. United States Dept. of Housing & Urban Dev., 436 F. 2d 809, 819 (3d Cir. 1970), "When an administrative decision is made without consideration of relevant factors it must be set aside"; Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608, 612, 620 (2d Cir. 1965), "The Commission has an affirmative duty to inquire into and consider all relevant facts." Hence, Standard 117 as presently formulated does not meet the Safety Act's requirements for safety

standards, particularly subsections 1392(a), 1392(f)(1), (3), and (4). As a spokesman for The Firestone Tire & Rubber Company, a major new tire firm that also produces retreads, noted, the respondents have failed to "demonstrat[e] that . . . [Standard] 117 is necessary, or even useful, to effectuate the purposes of the Act of 1966."

Because of our decision concerning the substantive invalidity of Standard 117, we do not address ourselves to petitioner's argument that the requirements of Section 4 of the A.P.A., 5 U.S.C. § 553, were not satisfied.

Insofar as Standard 117 incorporates the high speed and endurance tests of Standard 109, we set aside the order establishing the standard issued by the Department of Transportation, acting through the National Highway Traffic Safety Administration. The case is remanded for further proceedings not inconsistent with this opinion.

Set aside in part.

STEVENS, Circuit Judge (concurring).

As they are used, tires become less safe. Anyone who elects to drive at an excessive speed or on tires that have already traveled thousands of miles over a variety of road surfaces assumes some risk of tire failure. For that reason, at some point in time most car owners make a choice among four alternatives: (1) to continue driving on the old tires they then own; (2) to replace them with somewhat better used tires; (3) to replace them with retreads; or (4) to replace them with new tires.

Respondent has determined that the third alternative may not be selected unless the retread will last as long and perform just as well as a new tire. If that determination is enforced, the cost of retreads will increase and inevitably some car owners will reject the third alternative. Some will prolong their use of old tires; some will replace worn tires with others that are only slightly better; and the most cautious will pay the price of a new set of tires which may have a longer life expectancy than the used vehicle on which they will be placed. Thus, among the predictable effects of the enforcement of Standard 117 are the following: (1) some people will be driving on less safe tires; (2) some people will buy more expensive tires than they really need; and (3) since fewer retreads will be sold, new tire manufacturers will have less vigorous competition to face. In short, there is a cost to society at large associated with the enforcement of Standard 117.

On the other hand, it is no doubt true that the sale of defective retreads, or the sale of retreads that will not perform as long or as well as drivers anticipate, may pose a significant safety hazard. My problem with this case stems from the fact that there is nothing in the record to indicate that respondent assessed the magnitude of that potential hazard, or considered whether measures specifically mentioned in the statute, such as fair labeling, tire quality grading,[1] and limits on the age of tire carcasses which can be retreaded,[2] would sufficiently protect the consumer without curtailing his choice among apparently acceptable alternatives.[3]

Although I recognize that safety is the "overriding consideration in the issuance of standards" under this Act,[4] the statute requires respondent to consider whether a proposed standard is "reasonable, practicable and appropriate" before it is prescribed.[5] In my opinion this duty has not been discharged until respondent has at least identified some of the costs associated

1. 15 U.S.C. § 1423.

2. 15 U.S.C. § 1426.

3. A reading of the entire Subchapter II ("Tire Safety"), 15 U.S.C. §§ 1421–1426, plainly indicates that Congress contemplated that retreads would remain a viable consumer choice.

4. Senate Rep.No.1301, 89th Cong., 2d Sess. 6 (1966), p. 2714.

5. 15 U.S.C. § 1392(f)(3).

with the proposal and determined that these costs are overridden by reasonably predictable benefits. Since no such consideration is evidenced by this record, I agree that respondent failed to perform his statutory duty.