**NATIONAL TIRE DEALERS AND RE-
TREADERS ASSOCIATION, INC.,**
Petitioner,

v.

**Claude S. BRINEGAR,** Secretary of De-
partment of Transportation,
Respondent.

No. 72–1753.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 6, 1973.

Decided Jan. 8, 1974.

Robert L. Ackerly, Washington, D. C., for petitioner.

Michael Kimmel, Atty., Dept. of Justice, with whom Walter H. Fleischer, Atty., Dept. of Justice, was on the brief, for respondent.

Before TAMM, ROBINSON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

Petitioner National Tire Dealers and Retreaders Association, Inc. (NTDRA) seeks review of Federal Motor Vehicle Safety Standard No. 117,[1] issued on 23 March 1972 by the National Highway Traffic Safety Administration, a division of the Department of Transportation. Standard No. 117 was promulgated under the authority granted to respondent, the Secretary of Transportation, by section 103 of the National Traffic and Motor Vehicle Safety Act of 1966 (the Act).[2] Section 103 empowers the Secretary to "establish by order ap-

1. 49 C.F.R. § 571.117a (1972).

2. 15 U.S.C. § 1392 (1970) :
   Motor vehicle safety standards—
   Establishment
   (a) The Secretary shall establish by order appropriate Federal motor vehicle safety standards. Each such Federal motor vehicle safety standard shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms.
   Applicability of Administrative Procedure Act
   (b) The Administrative Procedure Act shall apply to all orders establishing, amending, or revoking a Federal motor vehicle safety standard under this subchapter.
   Effective date of orders
   (c) Each order establishing a Federal motor vehicle safety standard shall specify the date such standard is to take effect which shall not be sooner than one hundred and eighty days or later than one year from the date such order is issued, unless the Secretary finds, for good cause shown, that an earlier or later effective date is in the public interest, and publishes his reasons for such finding.
   Supremacy of federal standards; allowable higher standards for vehicles used by federal or state governments
   (d) Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed to prevent the Federal Government or the government of any State or political subdivision thereof from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard.
   Amendment and revocation of standards
   (e) The Secretary may by order amend or revoke any Federal motor vehicle safety standard established under this section. Such order shall specify the date on which such amendment or revocation is to take effect which shall not be sooner than one hundred and eighty days or later than one year from the date the order is issued, unless the Secretary finds, for good cause shown, than an earlier or later effective date is in the public interest, and publishes his reasons for such finding.
   Factors to be considered in prescribing standards
   (f) In prescribing standards under this section, the Secretary shall—
   (1) consider relevant available motor vehicle safety data, including the results of research, development, testing and evaluation activities conducted pursuant to this chapter;
   (2) consult with the Vehicle Equipment Safety Commission, and such other State or interstate agencies (including legislative committees) as he deems appropriate;
   (3) consider whether any such proposed standard is reasonable, practicable and appropriate for the particular type of motor vehicle or item of motor vehicle equipment for which it is prescribed; and
   (4) consider the extent to which such standards will contribute to carrying out the purposes of this chapter.
   Interstate motor carriers and carriers of explosives and other dangerous articles
   (g) In prescribing safety regulations covering motor vehicles subject to part II of the Interstate Commerce Act, as amended, or the Transportation of Explosives Act, as amended, the Interstate Commerce Commission shall not adopt or continue in effect any safety regulation which differs from a motor vehicle safety standard issued by the Secretary under this subchapter, except that nothing in this subsection

propriate Federal motor vehicle safety standards."

■ Petitioner focuses its challenge on paragraph S6.3.2 of Standard No. 117, which requires that all pneumatic passenger tires retreaded on or after 1 February 1974 have the following information *permanently* molded into or on one sidewall of the tire: size; maximum inflation pressure and load; actual number of plies or ply rating; the words "tubeless" or "tube-type," as applicable; and the words "bias/belted" or "radial," as applicable.[3] The administrative record does not adequately demonstrate that these requirements are practicable, nor does it establish any more than a remote relation between the requirements and motor vehicle safety. The Act mandates that motor vehicle safety standards promulgated thereunder be "practicable" and "meet the need for motor vehicle safety."[4] Therefore, we vacate that portion of the Order establishing Motor Vehicle Safety Standard No. 117 which relates to permanent labeling of tire size, maximum inflation pressure, ply rating, tubeless or tube-type, and bias/belted or radial construction. However, since section 201 of the Act commands that the Secretary promulgate permanent labeling standards with respect to actual number of plies and maximum permissible load,[5]

shall be deemed to prohibit the Interstate Commerce Commission from prescribing for any motor vehicle operated by a carrier subject to regulation under either or both of such Acts, a safety regulation which imposes a higher standard of performance subsequent to its manufacture than that required to comply with the applicable Federal standard at the time of manufacture.

Issuance of initial federal safety standards

(h) The Secretary shall issue initial Federal motor vehicle safety standards based upon existing safety standards on or before January 31, 1967. On or before January 31, 1968, the Secretary shall issue new and revised Federal motor vehicle safety standards under this subchapter.

3. 49 C.F.R. § 571.117a (1972) reads in pertinent part:

S6.3.2 Each retreaded pneumatic tire produced on or after [February 1, 1974] shall be permanently labeled in at least one location on the completed retreaded tire, in letters and numerals not less than three thirty-seconds of an inch that are molded into or onto the tire sidewall, with the following information:

(a) The tire's size designation;

(b) The tire's maximum permissible inflation pressure, either as it appears on the casing or as set forth in Table I;

(c) The tire's maximum load, either as it appears on the casing or as set forth in Table I;

(d) The actual number of plies, ply rating, or both;

(e) The word "tubeless" if the tire is a tubeless tire, or the words "tube-type" if the tire is a tube-type tire;

(f) the word "bias/belted" if the tire is of bias-belted construction;

(g) The word "radial" if the tire is of radial construction.

4. 15 U.S.C. § 1392(a) (1970).

5. 15 U.S.C. § 1421 (1970):

Labeling for pneumatic tires; required contents of label

In all standards for pneumatic tires established under subchapter I of this chapter, the Secretary shall require that tires subject thereto be permanently and conspicuously labeled with such safety information as he determines to be necessary to carry out the purposes of this chapter. Such labeling shall include—

(1) suitable identification of the manufacturer, or in the case of a retreaded tire suitable identification of the retreader, unless the tire contains a brand name other than the name of the manufacturer in which case it shall also contain a code mark which would permit the seller of such tire to identify the manufacturer thereof to the purchaser upon his request.

(2) the composition of the material used in the ply of the tire.

(3) the actual number of plies in the tire.

(4) the maximum permissible load for the tire.

(5) a recital that the tire conforms to Federal minimum safe performance standards, except that in lieu of such recital the Secretary may prescribe an appropriate mark or symbol for use by those manufacturers or retreaders who comply with such standards.

The Secretary may require that additional safety related information be disclosed to the purchaser of a tire at the time of sale of the tire.

the portion of Standard No. 117 relating to those characteristics must remain in effect.[6]

## I. STANDARD OF JUDICIAL REVIEW

■ Section 103(b) of the Act provides that "[t]he Administrative Procedure Act shall apply to all orders establishing, amending, or revoking a Federal motor vehicle safety standard . . . ." [7] In Automotive Parts & Accessories Association, Inc. v. Boyd [8] we held that this provision sanctions employment by the Secretary of the informal rule-making procedures set out in section 4 of the APA.[9] Standard No. 117 was the product of such informal rule-making [10] rather than formal adjudicatory procedures under sections 7 and 8 of the APA.[11] Petitioner has not challenged the procedures employed by respondent Secretary.

■ Judicial review of orders establishing motor vehicle safety standards is authorized by section 105 of the Act.[12]

6. We would note further that section 201 mandates permanent labeling of retreaded tires with information about "the composition of the material used in the ply of the tire." 15 U.S.C. § 1421(2) (1970). Standard No. 117, however, contains no requirement relating to ply composition. The reason for this omission is set forth in the preamble to Standard No. 117:

The proposed requirement that the tire be labeled with the generic name of its cord material is not retained. The comments have argued, and NHTSA agrees, that in the case of retreaded tires this information is not substantially related to safety. This, combined with the fact that it appears only on certain casings, where it must if it is to be relabeled, has convinced the NHTSA that at present the requirement should not be included in the standard.

37 Fed.Reg. 5952 (1972). Since Congress apparently concluded that permanent labeling of ply material is safety-related, the Secretary was powerless to conclude otherwise and thus erred in omitting a ply material requirement from Standard No. 117.

7. 15 U.S.C. § 1392(b) (1970).

8. 132 U.S.App.D.C. 200, 407 F.2d 330 (1968).

9. 5 U.S.C. § 553(b), (c) (1970).

10. The rule-making process began with Docket No. 1–8, Notice 67–5, Advance Notice of Proposed Rule-Making, 32 Fed.Reg. 14278 (1967). Numerous parties submitted comments on the Notice, and a technical conference was held on 10 April 1969 with representatives of the retreading industry. On 15 March 1970, the first formal Notice of Proposed Rule-Making for Safety Standard No. 117 was published. 35 Fed.Reg. 4136. Subsequently, on 17 April 1971, Safety Standard No. 117 was published. 36 Fed.Reg. 7135. In response to several motions for reconsideration, the Standard was amended and republished on 30 October 1971. 36 Fed.Reg. 20877. On 23 December 1971 a Notice of Proposed Rule-Making was published proposing new permanent labeling requirements. 36 Fed.Reg. 24825. The current Safety Standard No. 117 was published on 23 March 1972. Petitioner and others filed petitions for reconsideration on 21 April 1972. See Joint App. at 16–18. The petitions were denied on 15 July 1972. 37 Fed.Reg. 13991.

11. 5 U.S.C. §§ 556–557 (1970).

12. 15 U.S.C. § 1394 (1970):
Judicial review of orders establishing standards; additional evidence before Secretary; certified copy of transcript

(a)(1) In a case of actual controversy as to the validity of any order under section 1392 of this title, any person who will be adversely affected by such order when it is effective may at any time prior to the sixtieth day after such order is issued file a petition with the United States court of appeals for the circuit wherein such person resides or has his principal place of business, for a judicial review of such order. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Secretary or other officer designated by him for that purpose. The Secretary thereupon shall file in the court the record of the proceedings on which the Secretary based his order, as provided in section 2112 of Title 28.

(2) If the petitioner applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Secretary, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Secretary, and to be adduced upon the hearing, in such manner and upon such terms and conditions as to the court may seem proper. The Secretary may modify his findings as to the facts, or make new findings, by reason of

In *Boyd* we defined the scope of review of standards promulgated through informal rule-making procedures, such as those employed in the instant case:

> When the issue on appeal is whether a rule made in informal proceedings meets the criteria of Section 10, the court must necessarily go about the application of that standard in a manner unlike its review of findings of fact and conclusions of law compiled in a formal proceeding.
>
> This exercise need be no less searching and strict in its weighing of whether the agency has performed in accordance with the Congressional purposes, but, because it is addressed to different materials, it inevitably varies from the adjudicatory model. The paramount objective is to see whether the agency, given an essentially legislative task to perform, has carried it out in a manner calculated to negate the dangers of arbitrariness and irrationality in the formulation of rules for general application in the future.[13]

This is the standard of review which we apply in scrutinizing Motor Vehicle Safety Standard No. 117.

## II. RELATION OF THE CHALLENGED STANDARD TO SAFETY

The stated purpose of the National Traffic and Motor Vehicle Safety Act of 1966 is "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents."[14] Thus, "each . . . Federal motor vehicle safety standard . . . shall meet the need for motor vehicle safety."[15] The Act defines "motor vehicle safety" as "the performance of motor vehicles or motor vehicle equipment in such a manner that the public is protected against *unreasonable risk* of accidents occurring as a result of the design, construction or performance of motor vehicles and is also protected against *unreasonable risk* of death or injury to persons in the event accidents do occur . . . ."[16]

The general requirement that retreaded tires be labeled with the items of in-

the additional evidence so taken, and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original order, with the return of such additional evidence.

(3) Upon the filing of the petition referred to in paragraph (1) of this subsection, the court shall have jurisdiction to review the order in accordance with section 1009 of Title 5 and to grant appropriate relief as provided in such section.

(4) The judgment of the court affirming or setting aside, in whole or in part, any such order of the Secretary shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

(5) Any action instituted under this subsection shall survive, notwithstanding any change in the person occupying the office of Secretary [or] any vacancy in such office.

(6) The remedies provided for in this subsection shall be in addition to and not in substitution for any other remedies provided by law.

(b) A certified copy of the transcript of the record and proceedings under this sec-

tion shall be furnished by the Secretary to any interested party at his request, and payment of the costs thereof, and shall be admissible in any criminal, exclusion of imports, or other proceeding arising under or in respect of this subchapter, irrespective of whether proceedings with respect to the order have previously been initiated or become final under subsection (a) of this section.

13. 132 U.S.App.D.C. at 208, 407 F.2d at 338. The court concluded that the "substantial evidence" test of § 10(e)(2)(E) of the APA, 5 U.S.C. § 706(2)(E) (1970), by its terms applies only to rule-making conducted through adjudicatory hearings under sections 7–8, 5 U.S.C. §§ 556–557 (1970) and not to informal rule-making under section 4 of the APA, 5 U.S.C. § 553 (1970). Therefore, the scope of review of informal rule-making is more limited than in the case of formal, adjudicatory rule-making.

14. 15 U.S.C. § 1381 (1970).

15. 15 U.S.C. § 1392(a) (1970).

16. 15 U.S.C. § 1391(1) (1970) (emphasis supplied).

formation specified in paragraph S6.3.2 of Standard No. 117 clearly bears a substantial relation to the Act's purpose of achieving motor vehicle safety. As the preamble to the publication of Standard No. 117 states:

Size, maximum load, and maximum permissible inflation pressure are required because each is necessary for proper selection and use of passenger car tires.

\* \* \* \* \* \*

The words "bias/belted" and "radial" are required, where appropriate, in order to identify tires of different types of construction. There is presently a large body of opinion . . . that mixing tires of differing construction types on the same vehicle or same axle of a vehicle is not in the best interests of safety.

\* \* \* \* \* \*

The words "tubeless" or "tube type" are also required to be labeled onto completed retreaded tires. Almost all of the comments considered this information to be safety related.[17]

It is indisputable that labeling of tires is necessary to prevent mismatching, overloading, or overinflation, all significant safety hazards.

But the issue here is what relation *permanent* labeling has to avoidance of those hazards. Petitioner recognizes the importance of labeling retreaded tires with the information required by Standard No. 117, and states:

The retreading industry can and will record such information as is available on a label affixed to the retreaded tire so that the information will be known to the consumer at the time of purchase.[18]

However, petitioner asserts that *the Secretary "has not found* that the information required by S6.3.2 can meet the need for motor vehicle safety *only if it is permanently labeled into the retreaded tire."*[19]

A permanent labeling requirement is clearly unnecessary to protect original purchasers of retreaded tires. A non-permanent, affixed label can supply such purchasers with all the information specified in Standard No. 117 and thus permit them to select tires of proper size and construction. Therefore, lack of permanent labeling could become a factor affecting safety only in the event that a retreaded tire is resold or put to some different use after the affixed label has worn off. The Secretary raised this possibility in the preamble to Standard No. 117:

Tires . . . may be subject to many applications during their useful life. They are transferred from wheel to wheel and from vehicle to vehicle, and each time this takes place the information on the tire sidewall becomes important. Permanent labeling is therefore required if the information is to perform its function, as it can be readily assumed that affixed labels will last little longer than the first time the tire is mounted.[20]

The Secretary has supplied no illustrations or references to the record to amplify these observations. We can hypothesize two situations in which lack of permanent labeling could conceivably affect safety:

1. An original purchaser of retreaded tires wishes to replace one or more of those tires, and he needs to match up his

---

17. 37 Fed.Reg. 5951–52 (1972).

18. Brief for Petitioner at 24. For more detailed comments on the safety-relation of specific labeling requirements, see the responses of petitioner and other parties to the Department of Transportation's notices of proposed rule-making in the Joint Appendix at 124, 144–45, 161, 184, 185, 187, 189, 190, 209, 211. None of these comments, however, concedes that *permanent* labeling is

necessary to accomplish the safety goals underlying the requirements.

19. Brief for Petitioner at 24 (emphasis supplied). Under paragraph S6.3.1 of Standard No. 117, non-permanent labels containing the required information may be affixed to retreaded tires during the first year after the effective date of the amendment.

20. 37 Fed.Reg. 5952 (1972).

new tire or tires with the remaining retreads.

2. Someone wishes to purchase retreaded tires from the original purchaser or from some other second-hand source.

There is no suggestion in the record or briefs of how frequently these hypothetical situations arise. They might occur so rarely that a costly and burdensome permanent labeling requirement geared to ensure safety in such situations is unreasonable. Furthermore, it is not clear that a second-hand purchaser of retreads or an original owner who seeks replacements is dependent on the tires' labeling for information necessary to proper match-ups, inflation, and loading. The Secretary's brief observes that an expert can determine many of the critical characteristics of a tire by mere inspection.[21] Therefore, even in the hypothetical situations posed above, a permanent labeling requirement may not make a significant contribution to the Act's goal of enhancing the safety of motor vehicles. If there is a significant nexus between the permanent labeling requirement of Standard No. 117 and the goal of safety, it does not appear in the briefs or in the record of the rule-making proceedings.

■ As noted above, however, section 201 of the Act [22] mandates that new and retreaded pneumatic tires be "permanently and conspicuously labeled" with safety information which the Secretary "determines to be necessary to carry out the purposes" of the Act. The section further provides, "Such labeling shall include . . . (3) the actual number of plies in the tire. (4) the maximum permissible load for the tire. . . ." [23] Thus, Congress has determined that permanent labeling of ply

and load information on retreaded tires bears a significant relation to safety. Although our discussion of the relation of Standard No. 117 to safety applies with equal logic to permanent labeling of ply and load information, we must faithfully carry out the express mandate of Congress. No administrative procedure test applies to an act of Congress. Consequently, that portion of Standard No. 117 relating to permanent labeling of ply and load information must stand.[24]

## III. PRACTICABILITY OF THE CHALLENGED STANDARD

■ The apparently remote relationship between the permanent labeling requirements of Standard No. 117 and the goal of motor vehicle safety might be tolerable if those standards imposed no significant burden on the tire retreading industry. However, there are numerous indications in the record that permanent labeling of retreaded tires with the information required by Standard No. 117 would be economically unfeasible. In the face of these indications, the Secretary offers mere assertions, unsupported by any citations to the record, that the requirements are practicable. Therefore, the Secretary's Order establishing the permanent labeling requirements of Standard No. 117 is an "arbitrary" agency action that must be set aside under section 10(e) of the APA.[25]

Section 103(a) of the Act provides that each "Federal motor vehicle safety standard shall be practicable . . . ." [26] Section 103(f) further provides, "In prescribing standards under this section, the Secretary shall . . . (3) consider whether any such proposed standard is reasonable, practicable and appropriate for the particular type of motor vehicle or item of motor

---

21. Brief for Respondent at 29 n. 26.

22. 15 U.S.C. § 1421 (1970), set out in full in note 5 *supra*.

23. 15 U.S.C. § 1421(3), (4) (1970).

24. *See* note 6 *supra* for a discussion of the further requirement of section 201 that tires

be permanently labeled with information about the "composition of the material used in the ply of the tire." 15 U.S.C. § 1421(2) (1970).

25. 5 U.S.C. § 706(2)(A) (1970).

26. 15 U.S.C. § 1392(a) (1970).

vehicle equipment for which it is prescribed." [27] The Court of Appeals for the Seventh Circuit elaborated on the statutory term "practicable" in H & H Tire Co. v. Department of Transportation: [28]

> The House debate on its proposed safety bill suggests that by "practicable" the legislators meant that all relevant factors be considered by the agency, "including technological ability to achieve the goal of a particular standard as well as consideration of economic factors." 112 Cong.Rec. 19648 (Aug. 17, 1966). The Report of the Senate Commerce Committee recommending passage of the Senate's version of the safety act, which was the basis for the version ultimately enacted, stated: "The committee recognizes . . . that the Secretary will necessarily consider [in the issuance of standards] reasonableness of cost, feasibility and adequate lead time." (Citation omitted.) [29]

The record in the case at bar contains considerable comment to the effect that the permanent labeling required by Standard No. 117 would be unreasonably costly and economically unfeasible. The basic problem is that most tire casings received by retreaders either do not bear permanent labeling of the information required by Standard No. 117 or are labeled in a location where the markings are subject to obliteration during the retreading process. While permanent labeling of new tires has been required for several years by Motor Vehicle Safety Standard No. 109,[30] the *location* of the labeling was not specified until the Department of Transportation promulgated an amendment, effective 1 July 1973, which requires that one sidewall bear the requisite information between the "maximum section width and bead." [31] This belated recognition of the practicalities of the retreading process will ensure that the markings are not buffed off during retreading so that, eventually, as the Department explained, "retreaders need not relabel tires in meeting the requirements of Standard No. 117." [32]

The amended requirements for new tire labeling have little impact on the current inventories of new tire casings maintained by the retreading industry. It has been estimated that only about one third of the casings presently in supply bear the requisite labeling in a location where it is not subject to buffing off during the retreading process.[33] Therefore, Standard No. 117 would force the retreading industry to choose between two equally undesirable alternatives. First, retreaders might use only those new tire casings that bear the requisite information in a permanent location. This course of action would necessarily result in a two-thirds reduction in the volume of retreaded tire production and inevitably cause severe economic dislocation in the industry.[34] Second,

27. 15 U.S.C. § 1392(f) (1970).

28. 471 F.2d 350 (1972).

29. 471 F.2d at 353.

30. 49 C.F.R. § 571.109 (1972), first effective 1 August 1968.

31. 37 Fed.Reg. 23537 (1972).

32. *Ibid.*

33. Statement of Rubber Manufacturers Association, 28 December 1971, Joint App. at 145–46.

34. A significant decline in the volume of retreaded tires produced could adversely affect the consuming public. The court observed in H & H Tire Co. v. Department of Transportation:

> As the Safety Administration stated in its March 5, 1970 notice of proposed rulemaking, "There is a large segment of the motoring public that relies on retreaded tires for use on passenger cars." 35 F.R. 4136. In their responses to the notice, some retreaders stated that purchasers of retreads are often persons who cannot afford new tires or who, because of the expense of new tires, continue to use worn out tires much longer than they, in safety, should. The Safety Act explicitly recognizes that tires may be new or retreaded, *e. g.*, 15 U.S.C. § 1402(g), § 1421(1). This certainly militates against the idea that Congress intended to authorize the respondents to narrow the selection or alternatives available to consumers when

retreaders could mold the required information into the tire sidewalls during the retreading process. However, the comments of retreaders in the administrative record indicate that this, too, is far from an economically feasible alternative.

Apparently the retreading process cannot be economically adapted to labeling each tire permanently with the seven items of information required by Standard No. 117. Petitioner describes the retreading process as follows:

1. Careful selection and inspection of the casing as required by S5.2.1 and S5.2.2 of Safety Standard 117.

2. Removing the old tread by a process known as buffing which eliminates the shoulder of the tread and provides a smooth surface to apply the new rubber. During this process, any information appearing above the maximum section width of the tire is subject to being removed.

3. Affixing a new rubber surface to the tire by adhesion of the tread rubber to the casing, and

4. Vulcanizing the new tread to the casing in a mold or matrix under elevated temperatures and pressures. While new tires are produced in substantial factory runs where large quantities of tires should be identical, each retreaded tire is a separate and distinct product.[35]

In order to label tires permanently with the requisite information during this process "it would be necessary for an employee to work with hand-tools on a mold that would have a temperature somewhere between 250 and 300 degrees F. exposing him to the danger of burns in an effort to change the varied plates with this information on it as each tire is changed in the mold." [36] Altering the mold plates in this fashion would be necessary for almost every tire run through the production lines, since the size, number of plies, construction, maximum pressure, and other characteristics vary from tire to tire. As indicated by the table appended to Standard No. 117, there are 57 different tire sizes, three basic ply number-ply rating combinations, three maximum inflation pressures, and nearly 100 different maximum loads.[37] When the tube or tubeless, bias/belted, and radial factors are added to the mix, the possible combinations of characteristics become virtually limitless.[38] Thus, permanent labeling of retreads with the various items specified in Standard No. 117 might be loosely analogized to personalizing a set of wedding invitations by engraving each one with the name of the individual invitee: the engraving plate would have to be changed for each invitation printed. Retreaded tires are usually an economic necessity for the purchaser, not a luxury item.

One retreader has summarized the economic unfeasibility of the permanent labeling requirements specified in Standard No. 117:

As an experiment, we ran a series of casings that had labeling in the shoulder area that would be removed in the retreading process. Our experience has indicated that the best we can do with a relabeling program is to be 80% effective, and our additional cost is more than $2.50 per retread. This is an increase of 30%.[39]

Of course, the court need not accept at face value the self-serving comments of

they decide to buy automobile tires. 471 F.2d 350, 355 (7th Cir. 1972).

35. Brief for Petitioner at 5.

36. Letter from the Johnny Gillette Tire Co. in support of NTDRA Petition for Reconsideration, 21 April 1972, Joint App. at 240.

37. 49 C.F.R. § 571.117a (1972). It should be noted that maximum inflation pressure and maximum permissible load are direct functions of size and plies.

38. "A survey of 202 tires show that there were 82 different labeling combinations. A larger survey would undoubtedly show substantially more combinations." Letter from J. F. Hutchinson, Goodyear Tire and Rubber Co. to National Highway Traffic Safety Administration, 28 January 1972, Joint App. at 187.

39. Letter from Noyes Tire Co. in support of NTDRA Petition for Reconsideration, 21 April 1972, Joint App. at 240.

interested members of the retreading industry. However, such comments raise *serious doubts* about the *practicability* of Standard No. 117. In the face of these doubts, the Secretary offers only unsupported and unconvincing assertions that the permanent labeling requirements are practicable and economically feasible, and, in so doing, attempts to equate the data required for safety with that already required for record-keeping.[40] However, the information required by the Identification and Record Keeping Regulations is significantly different. It consists of such items as the name of the manufacturer and week in which the tire was retreaded.[41] With the exception of the latter, these items do not vary from tire to tire as do the items specified in Standard No. 117; the week of retreading can easily be changed at the start of each week while the retreading molds are cool. The Administration's further suggestion that casings could be sorted into uniform groups before retreading to minimize the frequency of alterations in the retreading mold appears reasonable, but there is nothing in the record to indicate whether such a sorting process would be practicable and not unreasonably costly.

Ultimately the Secretary's position rests on the following statement that appears in the Administration's Denial of Petitions for Reconsideration:

Many of the petitions request the NHTSA to furnish data supporting specific decisions and determinations reflected in the standard. The decisions and determinations embodied in this standard are based on all the information at the agency's disposal, together with the informed judgment and expertise of agency personnel. Documentary materials relating to NHTSA decisions regarding the standard are part of the public docket. The agency is not obliged by law, nor does it consider it appropriate, to categorize or interpret those records as supporting particular statements or decisions made on rule-making issuances.[42]

While it is true that an agency may act after informal rule-making procedures "upon the basis of information available in its own files, and upon the knowledge and expertise of the agency," [43] in the case at bar the Secretary's allusions to information and knowledge outside the record are unpersuasive in light of the powerful doubts raised by the on-the-record comments of petitioner and others about the practicability of the permanent labeling requirements. The Secretary's statement of the reasons for his conclusion that the requirements are practicable is not so inherently plausible that the court can accept it on the agency's mere *ipse dixit*.[44] We are compelled

---

40. In the preamble to Standard No. 117, the National Highway Traffic Safety Administration stated:

The NHTSA disagrees with industry claims that permanent labeling presents unreasonable technical problems. *Methods for permanent labeling developed for compliance with the Tire Identification and Recordkeeping Regulations (49 CFR Part 574) can be readily adapted to meet these requirements.* In fact, of all the information required in today's amendment, only the "size" and "maximum load rating" will vary to a significant amount from casing to casing. Each of the other items of required information can be applied uniformly to large groups of casings and need not be changed from tire to tire if proper sorting is done before retreading occurs.

37 Fed.Reg. 5952 (1972) (emphasis supplied). The preamble was attached pursuant

to section 4(b) of the Administrative Procedure Act, 5 U.S.C. § 553(c) (1970), which requires: "After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."

41. 49 C.F.R. § 574.5 (1972).

42. 37 Fed.Reg. 13992 (1972).

43. California Citizens Band Ass'n v. United States, 375 F.2d 43, 54 (9th Cir.), cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967).

44. In Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S.App.D.C. 200, 407 F.2d 330 (1968), which established the standard of judicial review for informal rule-making under the National Traffic and Motor Vehicle Safety Act, we affirmed the regulations in controversy, but only after finding that the

to conclude that the Secretary's practicability determination was arbitrary and thus requires us to set aside Standard No. 117 under section 10(e) of the APA.[45]

## IV. CONCLUSION

Under *Boyd,* our "paramount objective is to see whether the agency, given an essentially legislative task to perform, has carried it out in a manner calculated to negate the dangers of arbitrariness and irrationality in the formulation of rules for general application in the future."[46] On the basis of the present record, we can only conclude that the Secretary acted in a manner that did not "negate the dangers of arbitrariness and irrationality" when he promulgated the permanent labeling requirements of Standard No. 117. Therefore, we must set aside that portion of Motor Vehicle Safety Standard No. 117, paragraph S6.-3.2 which relates to permanent labeling of the following information: the tire's size, its maximum inflation pressure, its

ply rating, and whether it is tube-type or tubeless, bias/belted or radial.

Vacated in part.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge (concurring):

Given the narrow scope of judicial review of the Secretary's informal rule-making exercises,[1] I do not perceive any legal vulnerability in his finding that labeling of retreaded tires with the information his standard mandates is essential to achievement of the objectives of the Act. Nor do I share my colleagues' doubts that permanent labeling of that information on retreaded tires is vitally related to motor vehicle safety.[2] Not even the tire industry disputes the technological feasibility of a process by which data can be permanently labeled on retreaded tires.

The problem, rather, is that the Secretary's standard calls for permanent labeling on each retreaded tire of six individual characteristics of that tire. The methodology of permanent labeling on which the industry settled is insertion

---

agency's reasons for promulgating the regulations were either "evident to [the court] as a matter of common experience" or "amply supported by expert opinion *in the record.*" 132 U.S.App.D.C. at 211, 407 F.2d at 341 (emphasis supplied).

45. 5 U.S.C. § 706 (1970). It must be noted that by enacting section 201 of the Motor Vehicle Safety Act, 15 U.S.C. § 1421 (1970), set out in note 5 *supra,* Congress apparently concluded that permanent labeling of retreads with the actual number of plies and maximum permissible load would be practicable. *See* notes 22–24 *supra* and accompanying text. Therefore, we are powerless to overturn the corresponding portions of Safety Standard No. 117 on the ground of impracticability. Consequently, retreaders will be compelled permanently to label their tires with the actual number of plies, maximum permissible load and, pursuant to section 201(2) of the Act, 15 U.S.C. § 1421(2) (1970), "the composition of the material used in the ply of the tire." While permanent labeling of these three items will likely be difficult and costly for retreaders, it should not be as burdensome as the labeling of all seven items specified in Standard No. 117 would be.

46. 132 U.S.App.D.C. at 208, 407 F.2d at 338.

1. See Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S.App.D.C. 200, 208, 407 F. 2d 330, 338 (1968) ; H & H Tire Co. v. United States Dept. of Transportation, 471 F.2d 350, 352 (7th Cir. 1972).

2. The Secretary has found that:
   Tires . . . may be subject to many applications during their useful life. They are transferred from wheel to wheel and from vehicle to vehicle, and each time this takes place the information on the tire sidewall becomes important. Permanent labeling is therefore required if the information is to perform its function, as it can be readily assumed that affixed labels will last little longer than the first time the tire is mounted.
   37 Fed.Reg. 5952 (1972). His decision is to be embraced not only where its elements are "amply supported by expert opinion in the record," but also where they "seem[] evident to us as a matter of common experience." Automotive Parts & Accessories v. Boyd, *supra* note 1, 132 U.S.App.D.C. at 211, 407 F.2d at 341.

into the retread matrix of a slug that accomplishes the labeling. The number of combinations of characteristics is vast; a change of slugs becomes necessary each time a change of a single characteristic occurs, and the standard would currently intercept an estimated 20 million of the tires now retreaded annually.[3] The administrative record echoes the many complaints that operational and economic havoc in the retreading industry will be the inevitable result.

In this milieu, I agree that the Secretary was summoned to focus on these realities. The Act directs the Secretary to consider, among other things, whether standards he proposes are "practicable,"[4] and as the legislative history denotes, it does not suffice to view merely the "technological ability to achieve the goal of a particular standard."[5] "[E]conomic factors"[6] as well must be scrutinized, and these include "reasonableness of cost"[7] and "feasibility."[8] And beyond the effect of the standard on the retreading industry was its obvious impact on a large segment of the motoring public.[9]

Our function respecting the standard under attack is limited. Nonetheless, "[t]he availability of informal rule-making procedures is not equatable with administrative fiat."[10] "There must be some assurance discernible that the administrative action was reasoned and based on a consideration of relevant factors."[11] One may search the record before us for acceptable support for the Secretary's conclusion that the test of practicality was met, but the search will be in vain. That, in my view, is the fatal flaw in the Secretary's case.

---

3. Approximately 30 million tires are retreaded in the United States each year. Of that number only about one-third permanently label the data which the Secretary's regulation referable to new tires now requires.

4. National Traffic and Motor Vehicle Safety Act of 1966, Pub.L. No. 89-563, tit. I, § 103(a), (f)(3), 80 Stat. 718 (1966), 15 U.S.C. § 1392(a), (f)(3) (1970).

5. 112 Cong.Rec. 19648 (1966).

6. *Id.*

7. S.Rep.No. 1301, 89th Cong.2d Sess. 6 (1966).

8. *Id.*

9. See H & H Tire Co. v. United States Dept. of Transportation, *supra* note 1, 471 F.2d at 355. As the Secretary himself has stated "[t]here is a large segment of the motoring public that relies on retreaded tires for use on passenger cars." 35 Fed. Reg. 4136 (1970).

10. H & H Tire Co. v. United States Dept. of Transportation, *supra* note 1, 471 F.2d at 355.

