**CHRYSLER CORPORATION,**
Petitioner,

v.

**DEPARTMENT OF TRANSPORTA-
TION et al., Respondent.**

No. 74–1666.

United States Court of Appeals,
Sixth Circuit.

May 7, 1975.

Victor C. Tomlinson, Michael W. Grice, Thomas P. Donohue, Chrysler Corp., Detroit, Mich., Victor E. DeMarco, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for petitioner.

William B. Saxbe, U. S. Atty. Gen., Dept. of Justice, Washington, D. C., James B. Gregory, Administrator, National Highway Traffic Safety Administration, Dept. of Transportation, Washington, D. C., Robert Kopp, Barbara Herwig, Dept. of Justice, Donald Etra, Washington, D. C., for respondent.

Before PHILLIPS, Chief Judge, CELEBREZZE, Circuit Judge, and RUBIN, District Judge.*

PHILLIPS, Chief Judge.

Chrysler Corporation has petitioned this court for review of an order of the National Highway Traffic Safety Administration (NHTSA). The order in question amended Federal Motor Vehicle Safety Standard No. 108, 49 C.F.R. § 571.108, to permit the use of rectangular headlamps of specified dimensions in motor vehicles manufactured between January 1, 1974 and September 1, 1976. Chrysler generally favors the option to depart from the conventional circular headlamp shape but challenges the di-mensional restriction and the time limitation. For the reasons set forth below, we conclude that Chrysler's petition must be denied.

I

Under the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. § 1381 et seq., the NHTSA is authorized to establish minimum safety standards for the performance of motor vehicles and motor vehicle equipment. Standard No. 108 generally covers lamps, reflective devices, and associated equipment. Before adoption of the amendment that is being challenged here, Standard No. 108 permitted only two headlamp systems: (1) a two-lamp system composed of two circular lamps, 7 inches in diameter, capable of producing two beams, and (2) a four-lamp system, capable of producing two beams, composed of two circular, single-filament lamps, 5¾ inches in diameter, and two circular, dual-filament lamps, 5¾ inches in diameter.

For some time General Motors Corporation had been involved in a development program for rectangular headlamps. In late 1972, General Motors petitioned the NHTSA to amend Standard No. 108 to permit the use of rectangular headlamps. The petition proposed lamp dimensions of approximately 6½ inches by 4 inches.

On June 8, 1973, the NHTSA, in response to General Motors' petition, published Notice 5, which proposed an amendment to Standard No. 108 and invited comments. Under Notice 5, manufacturers would be given the option to use rectangular headlamps measuring approximately 6½ inches by 4 inches in the four-lamp system described above. The NHTSA explained the proposed amendment as follows:

> Where there is an equivalency of photometric output between headlamps with circular and rectangular lenses, the NHTSA has no evidence that one shape is superior to another.

---

* Honorable Carl B. Rubin, Judge, United States District Court for the Southern District of Ohio, sitting by designation.

The rectangular shape in various sizes has been used extensively in Europe during the last 10 years, and a number of foreign manufacturers selling vehicles in the United States have had to redesign their front ends so that round headlamps can be installed to meet standard No. 108. Allowing an alternate headlamp shape would relieve a design restriction imposed by standard No. 108, and permit manufacturers such as General Motors greater styling latitude in meeting front lighting performance requirements. Balanced against greater design freedom, however, is the safety consideration that there should not be such a proliferation of headlamp shapes and sizes that the motorist who has an immediate need to replace a headlamp has difficulty in finding one. Thus GM's suggestion that all dimensional requirements be eliminated has not been found to have merit.

In consideration of these factors, the NHTSA is proposing the specific headlamp dimension that GM discussed in its petition (a lens approximately 6½ in. by 4 in.). At this time, the agency's intent is to decide on one size for rectangular lenses, although it is possible that other manufacturers may have under development rectangular systems of different dimensions. Should comments indicate that this is the case, and that the proposed dimensions are inappropriate for these other systems, the NHTSA will review the matter carefully in reaching a decision whether to proceed with or to terminate rule-making action on this subject. 38 Fed.Reg. 15082 (1973).

Notice 5 gave no indication that the rectangular headlamp option would be available only for a limited time. In fact, the proposed effective date of the amendment was to be 30 days after final adoption rather than 180 days, as the Act requires in most circumstances.[1]

A number of comments were filed in response to Notice 5, and on November 30, 1973, the NHTSA published Notice 7, which formally adopted the option to use in the four-lamp system rectangular headlamps of essentially the dimensions specified in Notice 5. However, the amendment as adopted made the new option applicable only to vehicles manufactured between January 1, 1974 and September 1, 1976. Notice 7 explained the time limitation as follows:

These amendments to Standard No. 108 represent an interim rather than a final decision on the issues of rectangular headlamps and appropriate dimensions. During 1974 and 1975 NHTSA expects the world motor vehicle industry, through international standards organizations and regular trade and professional associations, to arrive, if possible, at a consensus for one set of requirements, including dimensions for rectangular headlamps. Late in 1975, the NHTSA intends to announce its final decision on the matter: whether to remain with the requirements and dimensions adopted in this notice, to propose and adopt others, or to revoke the option. The agency at this point is not committing itself either to adopt any consensus dimensions or to perpetuate the ones desired by General Motors, though the field experience with such lamps over the next two years may be expected to have some influence in the final decision. Adoption of these optional dimensions by a manufacturer during this interim period is at his own risk, and the cost of changing over from interim to permanent dimensions, if different, in 1977 model year tooling will not be considered a material factor in the decision on permanent di-

In Notice 5, the NHTSA stated that "[s]ince this proposal is for an added optional system of requirements, there is no need to allow leadtime for compliance." 38 Fed.Reg. 15083 (1973).

**1056**

mensions. It is planned that the interim amendment will be in effect through August 31, 1976, and that no petitions will be entertained for variant headlamp dimensions or system configurations before the end of that period, to avoid multiplying stock items and disrupting supply channels. 38 Fed.Reg. 33085 (1973).

Finally, Notice 7 provided that the amendment would become effective on January 1, 1974 for the following reason:

Because the amendment creates an optional system without imposing new mandatory requirements on any person it is found for good cause shown that an effective date earlier than 180 days after the issuance of the amendment is in the public interest. 38 Fed. Reg. 33086 (1973).

On December 21, 1973, Chrysler petitioned the NHTSA for reconsideration of the amendment to Standard No. 108. Chrysler argued that the time limitation was unreasonable, impracticable, and unrelated to motor vehicle safety and therefore was invalid under the Act. In April 1974, the NHTSA issued Notice 8 denying Chrysler's petition and further explaining the rationale underlying the time limitation:

The purpose of the time limit is to provide an interim period in which rectangular headlamps can be judged on their merits, and in which a worldwide consensus can be obtained as to a single set of dimensions for them. A rulemaking action which has as its goals the evaluation of a safety-related vehicle system within a specified time interval meets the need for motor vehicle safety. While it is true that the option termination date was not included in the NPRM (Notice 5), the NHTSA finds that adequate safeguards have been provided by the announcement in Notice 7 that it will make a final decision late in 1975 on the subject. If the decision is to terminate the option, that decision will be the subject of a rulemaking action, and an opportunity afforded for com-

ment. An important consideration is the possibility that on September 1, 1976, a different set of dimensions may become effective. The time limit is designed to facilitate planning, by placing the industry on notice of the interval within which the NHTSA will act on the issue. The NHTSA deemed this course of action preferable to an open-ended amendment. 39 Fed.Reg. 14210 (1974).

As provided by 15 U.S.C. § 1394(a)(1), Chrysler has now petitioned this court for review of the amendment to Standard No. 108.

## II

The Motor Vehicle Safety Act sets forth a number of substantive requirements that each safety standard must meet. For example, the Act defines safety standard as "a minimum standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria." 15 U.S.C. § 1391(2). This definition is reinforced by another section providing that each "standard shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms." 15 U.S.C. § 1392(a). Moreover, in prescribing safety standards, the NHTSA must consider whether the standard is "reasonable, practicable and appropriate for the particular type of motor vehicle or item of motor vehicle equipment for which it is prescribed," and it must consider the extent to which the standard will contribute to carrying out the purposes of the Act. 15 U.S.C. § 1392(f)(3)–(4).

In addition to these substantive criteria, safety standards also must meet certain procedural requirements. For example, the Administrative Procedure Act (APA) applies to all NHTSA orders establishing, amending, or revoking a safety standard. 15 U.S.C. § 1392(b). The NHTSA may amend a safety standard, as it did in this case, through an informal rule-making proceeding pur-

suant to § 4 of the APA, 5 U.S.C. § 553, rather than through formal adjudication under §§ 7 and 8 of the APA, 5 U.S.C. §§ 556, 557. National Tire Dealers & Retreaders Ass'n v. Brinegar, 160 U.S. App.D.C. 238, 491 F.2d 31, 34–35 (1974); Chrysler Corp. v. Department of Transportation, 472 F.2d 659, 667–68 (6th Cir. 1972); Wagner Electric Corp. v. Volpe, 466 F.2d 1013, 1014–15 (3d Cir. 1972). Thus the NHTSA must follow the procedures outlined in § 4 of the APA, including the requirement that the notice of proposed rule making must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

■ Finally, we must review the amendment to Standard No. 108 in accordance with § 10 of the APA, 5 U.S.C. § 706. *See* 15 U.S.C. § 1394(a)(3); Chrysler Corp. v. Department of Transportation, 472 F.2d 659, 670 (6th Cir. 1972). Thus Standard No. 108 cannot stand if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Against this statutory background, Chrysler launches substantive and procedural attacks against both the dimension restriction and the time limitation. We consider each in turn.

### III

■ Chrysler first contends that the dimensional restriction does not meet the need for safety as required by the Motor Vehicle Safety Act. *See* 15 U.S.C. §§ 1391(2), 1392(a). Chrysler essentially does not believe that proliferation of headlamp shapes and sizes will make it more difficult for motorists to obtain replacement lamps when the original equipment burns out or otherwise fails.

The record in this case, however, contains ample support for the NHTSA's conclusion that if headlamp sizes proliferate, many retailers will find it economically infeasible to stock the less popular types. As a result, some motorists will be unable to obtain replacements quickly and will continue driving even though one or more of the headlamps is inoperative. On the other hand, if only a few basic types of headlamps are in use, even the smallest retailer will be able to carry a full line of replacement lamps, thereby making it easier for motorists to avoid dangerously protracted periods of driving with a partially nonfunctioning headlamp system. This rationale is both logical and fully supported by the record. Accordingly, we cannot say that the dimension restriction imposed by the NHTSA does not meet the need for safety.

Chrysler suggests, however, that this argument, carried to the extreme, would authorize the NHTSA to prescribe a standard shape and design for all automobile components, a result clearly not intended by Congress. The short answer to this contention is that few auto parts are like headlamps. The record in this case indicates that the loss of one headlamp often will not induce a motorist to stop driving until a replacement can be found, even though forward illumination may be sharply reduced. Most other types of equipment failure either will not create a serious safety problem, or will present such obvious dangers that the driver will stop immediately for repairs or will immobilize the automobile entirely. Headlamp failure is singular in its capacity to jeopardize highway safety without arousing commensurate fear in the driver. Thus our analysis here is not necessarily applicable to cases in which the NHTSA may seek to standardize the design of other motor vehicle components in the name of safety.

Chrysler next argues that the dimensional restriction amounts to an invalid design restriction that is inconsistent with the definition of motor vehicle safety standards as minimum standards for vehicle or equipment performance. 15 U.S.C. § 1391(2). It is conceded that the Act defines "safety" at least in part in terms of design:

"Motor vehicle safety" means the performance of motor vehicles or motor vehicle equipment in such a manner that the public is protected against unreasonable risk of accidents occurring as a result of the *design*, construction or performance of motor vehicles . . . . 15 U.S.C. § 1391(1) (emphasis added).

Chrysler refers us, however, to the legislative history underlying the inclusion of the word "design" in this section:

The addition of the word "design" was accepted by the House managers not as an expansion of the authority of the Secretary but merely to clarify that the public is to be protected from inherently dangerous designs which conflict with the concept of motor vehicle safety and the performance standards issued by the Secretary. The Secretary is not to become directly involved in questions of design.

H.R.Rep.No.1919, 89th Cong., 2d Sess. (1966), 1966 U.S.Code Cong. & Admin. News, p. 2732.

Thus it appears that the presence of the word "design" was not intended to negate the basic concept that safety standards should be expressed in terms of performance rather than design. The rationale for this emphasis upon performance criteria was discussed briefly in the Senate Committee Report:

Unlike the General Services Administration's procurement standards, which are primarily design specifications, both the interim standards and the new and revised standards are expected to be performance standards, specifying the required minimum safe performance of vehicles but not the manner in which the manufacturer is to achieve the specified performance (sec. 101(b)). Manufacturers and parts suppliers will thus be free to compete in developing and selecting devices and structures that can meet or surpass the performance standard.

The Secretary would thus be concerned with the measurable performance of a braking system, but not its design details. Such standards will be analogous to a building code which specifies the minimum load-carrying characteristics of the structural members of a building wall, but leaves the builder free to choose his own materials and design. Such safe performance standards are thus not intended or likely to stifle innovation in automotive design.

S.Rep.No.1301, 89th Cong., 2d Sess. (1966), 1966 U.S.Code Cong. & Admin. News, pp. 2713–14.

These excerpts lead us to conclude that Congress had two purposes in directing the NHTSA to establish performance standards rather than design standards. First, Congress decided that the need for safety could best be met by encouraging competition among manufacturers in devising methods to achieve objective performance goals. Secondly, Congress evidently wished to avoid the tedious stylistic uniformity that would result if the NHTSA undertook to control vehicle design on a broad scale. The overriding purpose of the Act as a whole, of course, is "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381.

It is apparent to us that the dimensional restriction challenged here does not fit neatly within the statutory framework. Permitting rectangular headlamps of a single size only is in a sense a design restriction. Yet the overall safety and reliability of a headlamp system depends to a certain extent upon the wide availability of replacement lamps, which in turn depends upon standardization. Therefore uniformity of headlamp size is an element of headlamp performance. Design freedom would inhibit safety, and certainly the congressional purpose of encouraging safety-related competition among manufacturers is meaningless in this context. Moreover, we do not believe that standardization of headlamps is seriously inconsistent with the congressional desire not to stifle innovations in automotive styling. Headlamps are a relatively

small component in overall vehicle design, and they·have been standardized for many years without depriving motorists of a wide variety of automobile designs.

Although there is room for doubt, we conclude˚ that the dimension restriction at issue here essentially serves to ensure proper headlamp performance and lies within the regulatory authority granted by Congress to the NHTSA.

Finally, Chrysler argues that the dimensional restriction is arbitrary, capricious, and in excess of statutory authority and therefore invalid under § 10 of the APA, 5 U.S.C. § 706. What we have said above effectively disposes of the contention that the NHTSA exceeded its authority in prescribing a single set of dimensions for rectangular headlamps. This restriction constitutes an objective performance standard that meets the need for safety and otherwise complies with the substantive requirements set forth in the Motor Vehicle Safety Act. The NHTSA acted within its statutory authority in establishing this dimensional restriction.

In determining whether the NHTSA has acted arbitrarily and capriciously, we "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971); see Chrysler Corp. v. Department of Transportation, 472 F.2d 659, 670 (6th Cir. 1972). As the foregoing discussion intimates, we see no clear error in judgment in the NHTSA's decision. Moreover, the record in this case and Notices 5, 7, and 8 indicate that the NHTSA did consider the factors established by the Motor Vehicle Safety Act as relevant in prescribing safety standards. See 15 U.S.C. § 1392(f). In sum, we believe that the dimensional restriction is not invalid under the Administrative Procedure Act.

## IV

■ Chrysler objects strenuously to the 32-month time limitation imposed upon the rectangular headlamp option. The company makes a number of substantive and procedural arguments in support of its position that the NHTSA acted unlawfully in establishing a September 1, 1976 termination date for the new option.

Initially, we note that the Motor Vehicle Safety Act itself provides that the NHTSA "is authorized to issue, amend, and revoke such rules and regulations as [it] deems necessary to carry out this subchapter." 15 U.S.C. § 1407. We have held that this section applies to safety standards as well as to other types of regulations that the NHTSA may issue in administering the Act. Chrysler Corp. v. Department of Transportation, 472 F.2d 659, 680 (6th Cir. 1972). Since the NHTSA has been given express authority to revoke safety standards, it is difficult to understand why it may not announce in advance a termination date for one aspect of a standard. We think that the time limitation could be sustained as an exercise of the NHTSA's authority to amend and to revoke safety standards.

In addition, we find that Chrysler's specific statutory arguments are without merit. First, Chrysler contends that the time limitation does not meet the need for safety because there is no reason to believe that rectangular headlamps on vehicles manufactured before September 1, 1976 will be safer than those on vehicles manufactured after that date. This argument ignores the safety benefits derived from a trial period for new equipment. Notices 7 and 8 indicate that the NHTSA adopted the time limitation in order to establish an interim period in which to develop a consensus in the industry on the optimum dimensions for rectangular headlamps and in which the performance of the new headlamps can be judged on the merits. Viewed in this light, we conclude that the time limit does meet the need for safety.

Chrysler also asserts that it will be unable to take advantage of the rectangular headlamp option because it cannot complete the necessary engineering and retooling in time to produce automobiles equipped with the new headlamps before the option expires. Therefore, Chrysler argues that the early termination date is impracticable and thus invalid under the Motor Vehicle Safety Act. See 15 U.S.C. § 1392(a). We have some doubt that practicability is a significant principle in the context of an optional provision in a safety standard. A review of the cases in this area suggests the practicability requirement was designed primarily to prevent the NHTSA from establishing mandatory safety standards that are economically or technologically infeasible. See National Tire Dealers & Retreaders Ass'n v. Brinegar, 160 U.S.App.D.C. 238, 491 F.2d 31, 38–41(1974); Chrysler Corp. v. Department of Transportation, 472 F.2d 659, 672–74 (6th Cir. 1972); H & H Tire Co. v. Department of Transportation, 471 F.2d 350, 353–55 (7th Cir. 1972). In the case at bar, however, the use of rectangular headlamps is not required, and Chrysler is subject to none of the statutory penalties if it fails to comply with this aspect of Standard No. 108.

Even assuming that the practicability requirement is fully applicable in this situation, it would be difficult to conclude that the rectangular headlamp option is impracticable in any absolute sense. The record reveals that at least two manufacturers are presently capable of producing rectangular headlamps. It may be that lead-time problems will make it difficult or impossible for Chrysler to take advantage of the new headlamp option, but we decline to construe the practicability requirement to invalidate a permissive safety standard merely because all manufacturers do not derive benefits from it.

Chrysler next asserts that because the time limitation effectively confers a competitive advantage upon General Motors, it violates both the reasonableness standard of the Motor Vehicle Safety

Act, 15 U.S.C. § 1392(f)(3), and the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706. We are reminded that the early effective date of Notice 7 made it possible for General Motors to begin immediate production of the rectangular headlamps, which it had already designed and developed. Moreover, the early termination date and the uncertain future of the headlamp option make it difficult for Chrysler to obtain a similar advantage from the amendment to Standard No. 108. Chrysler estimates that it will be at least two and perhaps four model years behind General Motors in offering automobiles equipped with rectangular headlamps to the public.

We are not unsympathetic to Chrysler's predicament. The NHTSA could have delayed the effectiveness of Notice 7 in order to provide a sufficient lead time for all manufacturers to begin producing rectangular headlamps on an equal footing. No doubt this procedure would have improved Chrysler's competitive position, but it would have done so at the expense of General Motors' initiative. As the NHTSA observed in Notice 8, General Motors "was the only manufacturer to approach the agency with a concrete proposal, detailed specifications, and formulated plans to incorporate headlamps different from those required in Standard No. 108." General Motors invested time and money in the development of its rectangular headlamp system, and it took the risk that the NHTSA would reject the proposal entirely. So viewed, the early effective date of this optional safety standard seems more justifiable. In any event, Chrysler concedes that the effective date "is already past and cannot be changed." Brief for Petitioner at 36. Therefore, even if so disposed, we would be unable to grant any relief from the competitive disadvantage attributable to the early effective date of the rectangular headlamp option.

Chrysler insists, however, that the early termination date of the new safety standard also confers a competitive advantage upon General Motors. As we

view the situation, the uncertain future of the headlamp option is a disadvantage to all automobile manufacturers. Surely the fact that the option may be revoked or altered substantially is no more beneficial to General Motors than it is to Chrysler. Chrysler suggests that General Motors will suffer less from the NHTSA's final decision because it will have had the benefit of two model years' use of rectangular headlamps. As we indicated above, this advantage, if any, flows from the head start afforded by the early effective date and not from the early termination date. Accordingly, we conclude that Chrysler has not shown an injury to its competitive position sufficient to justify setting aside the time limitation as unreasonable or as arbitrary and capricious.

Chrysler's final argument is that the time limitation as promulgated in Notice 7 was not mentioned in the safety standard as proposed by Notice 5. As a result, Chrysler believes, interested parties were deprived of an opportunity to comment on the merits of the early termination date for the headlamp option. Thus Chrysler contends that the adoption of the time limitation was improper under § 4 of the APA, 5 U.S.C. § 553. It is clear that an administrative rule as adopted need not be identical to the proposed version of the rule. See South Terminal Corp. v. Environmental Protection Agency, 504 F.2d 646, 656–59 (1st Cir. 1974); Buckeye Cablevision, Inc. v. FCC, 128 U.S.App.D.C. 262, 387 F.2d 220, 226 & n. 26 (1967); California Citizens Band Ass'n v. United States, 375 F.2d 43, 47–49 (9th Cir.), cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). Indeed, the APA requires only that the notice of proposed rule making contain "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). When courts in the past have overturned an administrative regulation on the ground of inadequate notice, usually either the agency gave no notice at all or there were major substantive differences between the pro-

posed rule and the rule as adopted. *Compare* Texaco, Inc. v. FPC, 412 F.2d 740 (3d Cir. 1969), *with* Wagner Electric Corp. v. Volpe, 466 F.2d 1013 (3d Cir. 1972).

In the case at bar, however, Notice 5 fully informed interested parties of the substance of the proposed amendment, and the regulation as adopted did not embrace any major subjects that were not described in the notice of proposed rule making. We are unwilling to set aside this administrative action merely because the rectangular headlamp option, proposed without mention of a time limitation, ultimately was adopted as only an interim amendment.

The petition for review is denied. No costs are taxed. Each party will bear its own costs on this appeal.