919 F.2d 1148
 NATIONAL TRUCK EQUIPMENT ASSOCIATION, Petitioner,
v.
NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, United
States Department of Transportation, and the
United States of America, Respondents.
 No. 89-3713.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 13, 1990.
Decided Nov. 28, 1990.
 
 Mark M. Levin, Kimberly Madigan, Christopher Eric Hagerup, Irving P. Margulies (argued), Mark H. Sidman, Weiner, McCaffrey, Brodsky & Kaplan, Washington, D.C., for petitioner.
 Stephen P. Wood, Enid Rubenstein (argued), Kenneth N. Weinstein, National Highway Traffic Safety Admin., Washington, D.C., for National Highway Traffic Safety Admin.
 Jim J. Marquez, U.S. Dept. of Transp., Washington, D.C., for United States Dept. of Transp.
 Richard L. Thornburgh, Atty. Gen., U.S. Dept. of Justice, Anti-Trust Div. Appellate Section, Washington, D.C., for U.S.
 Before MERRITT, Chief Judge, and MARTIN and GUY, Circuit Judges.
 MERRITT, Chief Judge.
 
 
 1
 The U.S. market is significant for custom-made trucks below 10,000 pounds gross vehicle weight range used for delivery and other purposes. It is estimated that in 1987 there were 240,000 such trucks manufactured. In order to manufacture custom-made trucks, a customizer or fabricator, called a "final-stage manufacturer," starts with a truck chassis with engine, drive train, and steering column in place purchased from a first-stage truck manufacturer like Ford or General Motors.
 
 
 2
 In 1985 the Secretary of the Department of Transportation, through its subordinate agency, the National Highway Traffic Safety Administration, approved a new steering column standard, Federal Motor Vehicle Safety Standard No. 204, governing the manufacture of trucks under 5,500 pounds unloaded vehicle weight and under 10,000 pounds gross vehicle weight range, which includes many custom-made trucks. The new rule requires that in a head-on collision the steering column "shall not be displaced more than 5 inches in a horizontal rearward direction parallel to the longitudinal axis of the vehicle." 49 C.F.R. Sec. 571.204-S4.2 (1989).[1]
 
 
 3
 The petitioner, a trade association said to represent 1,400 "final-stage manufacturers," does not have a problem with the substantive part of the 5-inch rearward displacement rule. It has a problem with the procedures for proving compliance. It claims, in effect, that certification procedures required for compliance are designed for mass-produced cars and trucks and that these procedures allow insufficient leeway for small-scale customizers without large engineering and testing departments to bring their individually-made trucks into compliance.
 
 
 4
 Thus, the petitioner claims, in this review proceeding brought under the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. Sec. 1394(a)(1),[2] that the compliance regulations are not "practicable," as required by 15 U.S.C. Sec. 1392(a) and (f)(3).[3] For the reasons given below, we agree and remand the case to the administrative agency for further rulemaking proceedings designed to correct the defects we find in the compliance procedures.
 
 
 5
 * When the Administration in 1978 first proposed rules governing steering columns, windshields, and other parts, it exempted customized trucks by making its regulation applicable to vehicles with an unloaded vehicle weight of 4,000 pounds or less. It excluded these vehicles because it recognized that final-stage manufacturers would have difficulty complying with the steering column regulation in its proposed form. 44 Fed.Reg. 68,470, 68,471 (1979). Similar problems plagued the windshield regulations. Having worked out the compliance problems with the windshield regulations, the Administration then amended those regulations so that they would apply to vehicles of 5,500 pounds or less, an amendment which included within its scope many customized trucks.
 
 
 6
 The Administration then proposed to apply the 5-inch steering column displacement rule to the same vehicles having a weight of 5,500 pounds or less. The customized truck industry complains that there are only two ways to show compliance, neither of which is "practicable." Either the customizer must get a so-called "pass-through" certification from the chassis manufacturer, or run crash tests or elaborate engineering studies on the individual custom-made truck in question. The petitioner says that such manufacturer certifications are simply not available in most situations, and that conducting the crash tests or the engineering studies on each custom-made truck is so expensive that purchasers could not afford to buy a truck with these costs built in. We will explain the regulatory framework and the state of the administrative record on these issues of "practicability."
 
 II
 
 7
 When a company needs a specialized truck, like a delivery truck for bakery goods, it cannot go to its local truck dealer and order a bread delivery truck. Because this kind of vehicle is specialized, the large automobile and truck companies generally do not make them. The gap in the market is filled by small companies, final-stage manufacturers, that do nothing but outfit trucks for specialized uses. These smaller companies take chassis in various forms from the big truck makers and put on the required equipment, e.g. racks to hold loaves of bread for delivery. To buy a specialized vehicle, a customer goes to a local dealer of one of the big manufacturers and purchases a chassis of some sort. He or she can buy one of basically three forms of chassis: a chassis-cab, which has a completed passenger compartment area; a cutaway, which has a complete cab except that it lacks a back wall; or a stripped chassis, which has no cab compartment at all. The customer picks one of these depending upon his or her needs and the advice he or she receives from the dealer. The dealer then refers the customer to a final-stage manufacturer, who equips the truck according to the customer's needs.
 
 
 8
 The manufacturer of a motor vehicle must certify that the finished product complies with all applicable Federal Motor Vehicle Safety Standards. 15 U.S.C. Sec. 1397(a)(1) (1988). A final-stage manufacturer is a manufacturer of motor vehicles for the purposes of this statute. 15 U.S.C. Sec. 1391(5) (1988) (" 'Manufacturer' means any person engaged in the manufacturing or assembling of motor vehicles or motor vehicle equipment...."). If a manufacturer fails to comply with the applicable standards, it faces stiff penalties. Each unit produced in violation of the standards represents a $1,000 fine. 15 U.S.C. Sec. 1398(a) (1988) ($1,000 penalty for each violation up to $800,000). In addition, failure to certify that a vehicle conforms to all applicable standards can expose the manufacturer to a product liability action by an injured customer. 15 U.S.C. Sec. 1397(k) (1988) (conformance with standards does not exempt manufacturer from common law liability); Sklaren, The Effect of Current NHTSA Regulations and Enforcement Policy on Products Liability in the Motor Vehicle Industry, 21 Tort & Ins.L.J. 464 (1986). The fine provisions do not apply to "any person who establishes that he did not have reason to know in the exercise of due care that such vehicle or item of motor vehicle equipment is not in conformity with applicable Federal motor vehicle safety standards...." 15 U.S.C. Sec. 1397(b)(2) (1988); see also 15 U.S.C. Sec. 1397(a)(1)(C) (illegal to fail to issue a certificate or to "issue a certificate to the effect that a motor vehicle ... conforms to all applicable Federal motor vehicle safety standards, if such person in the exercise of due care has reason to know that such certificate is false or misleading in a material respect....").
 
 
 9
 In the case of a customized truck, the vehicle is started by the chassis manufacturer and finished by the final-stage manufacturer. Under the Administration's regulations, both of these manufacturers share some responsibility for the certification of the final product. The Administration has no regulation detailing who must certify that a motor vehicle assembled in two or more stages complies with all applicable safety standards. Instead, it has labeling requirements that implicitly describe the division of responsibility. Incomplete manufacturers must supply with their chassis an incomplete vehicle document fulfilling one of three conditions listed in 49 C.F.R. Sec. 568.4(a)(7) with respect to each safety standard. The chassis manufacturer can supply "[a] statement that the vehicle when completed will conform to the standard if no alterations are made in identified components of the incomplete vehicle." 49 C.F.R. Sec. 568.4(a)(7)(i) (1989). Or the chassis manufacturer can supply "[a] statement of specific conditions of final manufacture under which the manufacturer specifies that the completed vehicle will conform to the standard." 49 C.F.R. Sec. 568.4(a)(7)(ii) (1989). Or the chassis manufacturer can simply provide "[a] statement that conformity with the standard is not substantially affected by the design of the incomplete vehicle, and that the incomplete vehicle manufacturer makes no representation as to conformity with the standard." 49 C.F.R. Sec. 568.4(a)(7)(iii) (1989). This information constitutes what the Administration refers to as the "envelope" of the chassis--i.e. the limitations that the chassis manufacturer places on the performance of the chassis.
 
 
 10
 The Administration's regulations consider all types of chassis as incomplete vehicles. " 'Incomplete vehicle' means an assemblage consisting, as a minimum, of frame and chassis structure, power train, steering system, suspension system, and braking system, to the extent that those systems are to be part of the completed vehicle, that requires further manufacturing operations ... to become a completed vehicle." 49 C.F.R. Sec. 568.3 (1989). Chassis-cabs constitute a distinct subset of incomplete vehicles. " 'Chassis-cab' means an incomplete vehicle, with a completed occupant compartment, that requires only the addition of cargo-carrying, work-performing, or load-bearing components to perform its intended functions." 49 C.F.R. Sec. 567.3 (1989). How a final-stage manufacturer then certifies the completed vehicle turns on the type of chassis that the customer chooses.
 
 
 11
 For any incomplete vehicle, the manufacturer of the chassis and any intermediate manufacturer must affix labels in accordance with 49 C.F.R. Sec. 567.5(a), (b) (1989). The provisions of these regulations are irrelevant to this proceeding because we are faced only with the grievances of final-stage manufacturers. The final-stage manufacturer may use one of three statements to certify that the vehicle meets federal standards. One applies to all incomplete vehicles and will be detailed below. The other two apply only to chassis-cabs. A final-stage manufacturer completing a chassis-cab may, on the one hand, certify a completed vehicle with the following legend:
 
 
 12
 "Conformity of the chassis-cab to Federal Motor Vehicle Safety Standards, which have been previously fully certified by the incomplete vehicle manufacturer or intermediate vehicle manufacturer, has not been affected by final-stage manufacture. The vehicle has been completed in accordance with the prior manufacturer's instructions, where applicable. This vehicle conforms to all other applicable Federal Motor Vehicle Safety Standards in effect in (month, year)."
 
 
 13
 49 C.F.R. Sec. 567.5(c)(7)(i) (emphasis added). The final-stage manufacturer must meet several restrictions in order to use this legend. First, he or she must have not "affected conformity to standards compliance ... which has been certified by a chassis-cab manufacturer...." Id. at Sec. .5(c)(7)(i)(A). Second, the final-stage manufacturer must have completed the vehicle in accordance with the manufacturer's instructions. Id. at Sec. .5(c)(7)(i)(B). If the final-stage manufacturer meets these two conditions, however, he or she may rely on the chassis manufacturer's certification. The Administration refers to this process as "pass through" certification.
 
 
 14
 On the other hand, the final-stage manufacturer completing a chassis-cab can use another form of certification, using the following legend:
 
 
 15
 "Conformity of the chassis-cab to Federal Motor Vehicle Standards Nos. ------ has not been affected by final stage manufacture. With respect to Standards Nos. ------, the vehicle has been completed in accordance with the prior manufacturer's instructions. This vehicle conforms to all other applicable Federal Motor Vehicle Safety Standards in effect in (month, year)."
 
 
 16
 49 C.F.R. Sec. 567.5(c)(7)(ii) (1989) (emphasis added). To use this form of certification, the final-stage manufacturer fills in the first blank with those standard numbers that the chassis-cab manufacturer certified the chassis cab for, and fills in the second blank with those standards for which the chassis-cab manufacturer issued a conditional certification. In this certification and the first, the final-stage manufacture may rely on the certification performed by the incomplete and intermediate manufacturers and pass through that certification to the customer. These two certification regulations apply only to chassis-cabs, as the emphasized portions of the quoted language indicate.
 
 
 17
 In the case of incomplete vehicles other than chassis-cabs, the final-stage manufacturer cannot pass through the certification provided by the chassis manufacturer. Instead, the final-stage manufacturer may only use the following label for certification: " 'This vehicle conforms to all applicable Federal Motor Vehicle Safety Standards in effect in (month, year).' " 49 C.F.R. Sec. 567.5(c)(7)(iii) (1989). The pass-through regulations apply only to chassis-cabs, not to all incomplete vehicles, even though a chassis manufacturer must supply with all incomplete vehicles information dictating the limits of the chassis and under what conditions it will comply with the safety standards. When a final-stage manufacturer completes a vehicle on a cutaway chassis or stripped chassis, he or she must either ensure compliance or have some reason to believe that he or she is exercising due care with respect to the safety standards and is exempt under the due care provisions of 15 U.S.C. Sec. 1397(a)(1)(C) and (b)(2) from the penalties for failure to certify a vehicle.
 
 III
 
 18
 The Administrative Procedure Act sets the standard of review applied in cases of appeals from agency rulemaking. We must uphold a rule unless it exceeds the authority vested in the agency by Congress or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. Sec. 706(2)(A) (1988). The Supreme Court has described in some depth what this review means.
 
 
 19
 Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.
 
 
 20
 Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). This case is particularly apt because there the Supreme Court reviewed an action taken by the same agency before us. While the Supreme Court in State Farm reviewed the Administration's revocation of a rule as opposed to the adoption of a rule, it held that the standard of review is the same regardless of the agency action. Id. at 41, 103 S.Ct. at 2865. The Court also implicitly reaffirmed this Court's holding that "[a]ny safety standards issued pursuant to the Automobile Safety Act of 1966 must be tested for compliance with the statutory limitations of that Act, and this testing can only be done against the record." Chrysler Corp. v. Department of Transp., 472 F.2d 659, 669 (6th Cir.1972). We must therefore turn to the record of the Administration's rulemaking and determine whether the Administration's decision to extend the steering column standard from vehicles with an unloaded weight of 4,000 pounds to vehicles with an unloaded weight of 5,500 pounds finds adequate support in that record and overcomes the objections raised by petitioners. In doing so, we must remember that "[t]he Secretary's statement of the reasons for his conclusion that the requirements are practicable is not so inherently plausible that the court can accept it on the agency's mere ipse dixit." National Tire Dealers & Retreaders Ass'n v. Brinegar, 491 F.2d 31, 40 (D.C.Cir.1974).
 
 
 21
 The proposed amendment does not meet the statutory test. The Administration provided no means of compliance for final-stage manufacturers. This problem renders the standard contrary to the statutory requirements set forth in 15 U.S.C. Sec. 1392(a) that standards promulgated "be practicable."
 
 
 22
 In order for a standard to meet the practicability requirement, it must offer the regulated party a chance to demonstrate compliance. The Ninth Circuit faced this precise issue when it reviewed air brake regulations for trucks in Paccar, Inc. v. National Highway Traffic Safety Administration, 573 F.2d 632 (9th Cir.), cert. denied, 439 U.S. 862, 99 S.Ct. 184, 58 L.Ed.2d 172 (1978). That court held the regulation proposed impracticable because it failed to provide adequate compliance provisions for manufacturers of complete trucks and for final-stage manufacturers. The standard had two problems in its compliance provisions with respect to final-stage manufacturers. First, the test was too expensive for the final-stage manufacturers to perform. Id. at 645 & n. 59 (cost of testing each vehicle $2,000 to $4,000). Second, the standard itself provided no alternative to compliance other than testing. Although the Administration argued that alternative methods, such as mathematical models, would meet the "due care" provisions of the Act, the Ninth Circuit rejected these alternatives. Id. at 645. The Administration had to put the alternatives in the standard itself. "Successive authorities of [the Administration] might take an entirely different view than that announced by the incumbents, and subjecting the manufacturers to such a risk does not comport with due process requirements." Id. at 645-46. Thus, for a standard to be practicable, it must offer, in the body of the standard itself, a means for all subjected to the standard to prove compliance.
 
 
 23
 The Ninth Circuit linked the ability to comply with the costs of compliance, as this Court did when reviewing airbag standards in the early 1970's. We held then that the Administration may require the industry to create technology in order to meet new standards. This did not imply that the Administration "might impose standards so demanding as to require a manufacturer to perform the impossible, or to impose standards so imperative as to put a manufacturer out of business." Chrysler Corp. v. Department of Transp., 472 F.2d at 672-73. The economic effect of a regulation alone, it is said, cannot render a rule impracticable. If, however, as in this case the safety effects are in question because they are not clear, a large economic effect on the industry can render that standard impracticable. The Seventh Circuit noted this in a case involving proposed regulation of retreaded tires that would have required such tires to perform as well as new tires.
 
 
 24
 The deleterious economic effect on the industry of required compliance with Standard 117 might be permissible if retreads unquestionably were major safety hazards and if compliance with the standard clearly enhanced retreads' safety under on-the-road conditions. However, it appears to be a fair statement from the record that, except for excessive wear (bald or thin tires), tires in general, retreaded tires included, pose no significant safety problem.
 
 
 25
 H & H Tire Co. v. United States Dep't of Transp., 471 F.2d 350, 354 (7th Cir.1972). The Seventh Circuit then criticized the Administration further: "It ... adopted a rule which, if implemented now, might possibly destroy a well-established industry." Id. at 355. Thus, if the Administration has provided no way for final-stage manufacturers to comply with the proposed amendment, we must find that the rule is impracticable because it would destroy the well-established and vital industry of truck customizing.
 
 
 26
 The safety effects of raising the standard to include customized trucks between 4,000 and 5,500 pounds but excluding trucks above that weight are not at all clear. When the Administration initially considered the safety effects of the steering column displacement standard, it relied on studies that combined the effects of a standard requiring steering wheel padding and the standard limiting rearward displacement of steering columns. The Administration had no evidence of the effect of the rearward displacement standard alone. Furthermore, the Administration announced the amendment to the rearward displacement standard to bring its weight limit in line with two windshield safety standards. There is no reason offered for this correspondence. One can assume from general knowledge about automobiles that the weight of the vehicle may have different effects on the steering column and on the windshield. There might be good reason to have different weight requirements for the standards. As we discuss further below, there might also be compliance problems with a steering column regulation that do not plague windshield regulations. In addition, the safety effects for customized trucks are not necessarily the same as for pickup trucks or private cars. First, most commercial vehicles and vehicles completed by a final-stage manufacturers are driven by professional drivers. While Congress intended the Administration to issue regulations designed to improve cars and not simply focus on the "nut behind the wheel," S.Rep. No. 1301, 89th Cong., 2d Sess., reprinted in 1966 U.S.Code Cong. & Admin.News 2709, 2710, the Administration still must evaluate the abilities and predilections of drivers when it issues standards. See Pacific Legal Found. v. Department of Transp., 593 F.2d 1338, 1345-46 (D.C.Cir.), cert. denied, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979). Second, most commercial vehicles and vehicles completed by final-stage manufacturers are not used on the highways but are primarily used in short-distance, low-speed trips. Final Rule, 44 Fed.Reg. 68,470, 68,473 (1979).
 
 
 27
 Thus we are justified in reviewing the record to determine the economic effects of the regulation. We find that the Administration has afforded final-stage manufacturers no ability to prove compliance with the standard. The Administration has conceded that dynamic testing--actually crashing the trucks into a wall--exceeds the capabilities of final-stage manufacturers. 54 Fed.Reg. 24,344, 24,348 (1989). The proposed standard, set forth in footnote 1 supra, requires dynamic testing. Even if final-stage manufacturers could meet the standard through engineering studies--an alternative that the Ninth Circuit rejected in Paccar because it was not written into the standard under review in that case--the Administration has conceded that such studies also exceed the financial capacities of the small businesses that make up the final-stage manufacturing industry. In rejecting the petition for reconsideration, the Administration referred to the reasoning it used to reject petitioner's criticism of a proposed amendment to the seat belt standard. The Administration admitted with respect to the seat belt standard that "very few final-stage manufacturers and alterers have the technical and financial resources necessary to conduct testing or engineering analyses to determine compliance with dynamic test requirements." 54 Fed.Reg. 24,344, 24,349 (1989). Thus far, the standard under review here offers no realistic way for the final-stage manufacturers to comply with it and thereby meet their duty to certify the safety of the vehicle.
 
 
 28
 The Administration responds that the final-stage manufacturers can pass through the certification for the chassis to the final customer. As shown above, however, pass through certification applies only to vehicles that start as chassis-cabs. The final-stage manufacturer must certify the entire vehicle if he or she starts with a cutaway chassis or stripped chassis. Unless the certification regulations are not to be read as they are written, this is an inadequate form of compliance with the standard. In addition, the Administration has admitted that incomplete vehicle manufacturers have every incentive to make the envelope of completed vehicle specifications as narrow as possible and thereby place the burden of certification on final-stage manufacturers. 50 Fed.Reg. 13,402, 13,403 (1985). The record also demonstrates that manufacturers will narrow their envelopes as a result of the amended steering column standard. When the Administration first proposed applying the steering column standard to trucks, the Ford Motor Company informed the Administration that "[t]he effect of ... another standard that involves barrier crash testing[ ] will be to increase the cost of supporting the incomplete vehicle market and could further reduce the utility or availability of some ... chassis-cabs." Letter from Ford Motor Co., Docket No. 78-16-NO1-050 (Feb.1979); see also Letter from General Motors, Docket No. 78-16-NO6-003 (Dec.1987) (effect of amending standard would "limit the extent to which initial manufacturers would provide certification for efforts anticipated by final stage manufacturers or vehicle alterers."). If these restrictions occur, as initial manufacturers say they will, final-stage manufacturers will not be able to pass through the initial certification of the chassis because of the more limited envelope.
 
 
 29
 The Administration responds that this problem is illusory. In response to petitioner's petition for reconsideration, it referred to the petitioner's objections to a proposed amendment to the seat belt standard, and lumped the two objections together. The Administration claimed that final-stage manufacturers who cannot prove compliance with the steering column displacement standard could not prove compliance with the amended seat belt standard that applies to trucks. The Administration thus concluded that many final-stage manufacturers could not complete such vehicles in any event because even if exempted from the steering column standard they could not prove compliance with the seat belt standard. 54 Fed.Reg. 24,344, 24,349 (1989). This response does not meet the criticism. First, the Administration has no evidence on the record demonstrating that the problems that hinder certification under the seat belt standard also hinder certification for the rearward displacement standard. Second, the Administration amended the steering column standard ostensibly to bring it in line with the weight limits of the two windshield standards. 52 Fed.Reg. 44,893, 44,895 (1987). Only upon the petitions for reconsideration did the Administration even mention the seat belt standard. Furthermore, even if the Administration had referred to the two windshield standard in its denial of reconsideration, that response would be inadequate without more elaboration. There might be great differences in the ability to prove compliance with a windshield regulation than in proving compliance with a steering column regulation. For example, chassis manufacturers might create a less restrictive envelope for the windshield than for the steering column.
 
 
 30
 The Administration also offers final-stage manufacturers the option of using a larger chassis or loading up the completed vehicle so that it exceeds the weight limitations of the amended steering column standard. This option is also not a real option. While it would exculpate final-stage manufacturers from the certification problem, it would force them to limit the choice of the customer, who ordinarily requests a particular type of chassis to perform a particular job. In addition, this option for compliance vitiates the purpose of the Administration. It essentially encourages final-stage manufacturers to use larger chassis to circumvent the safety regulations that the Administration thought were important enough to apply to such vehicles in the first place.
 
 
 31
 A careful review of the record reveals that the Administration never considered this problem carefully, and largely ignored it when private parties raised it. In the initial regulatory evaluation, the Administration did not consider the problems of final stage manufacturers. Preliminary Regulatory Evaluation, Docket No. 78-16-NO1-001 (Nov.1978). The Administration received many comments pertaining to compliance problems facing final-stage manufacturers.[4] The Final Regulatory Evaluation contains no discussion of the compliance problems facing the final-stage manufacturing industry, but the Administration decided to limit the applicability to vehicles with an unloaded vehicle weight under 4,000 pounds. Final Regulatory Evaluation, Docket No. 78-16-NO1-060 (Nov.1979); Final Rulemaking, 44 Fed.Reg. 68,470 (1979).
 
 
 32
 When the Administration reevaluated the proposed amendment to raise the unloaded vehicle weight, they reviewed the effect on the final stage manufacturing industry.
 
 
 33
 To the extent that such vehicles [those to which the amendment would apply] are modified for special uses by second stage manufacturers, many of them small businesses, the requirements of the proposed rule are not expected to have any effect on their operations. If second stage manufacturers add weight beyond 5,500 pounds, such vehicles are not subject to the standard. The only impact on these manufacturers could be a relatively small increase in vehicle price which normally could be passed on to the consumer.
 
 
 34
 Preliminary Regulatory Evaluation, Docket No. 78-16-NO4-001, at 4 (Feb.1985). These three sentences constitute the complete discussion of the compliance problem faced by final-stage manufacturers in the initial evaluation of the proposed amendment.
 
 
 35
 Two manufacturers objected to the proposed amendment based on the impact on final-stage manufacturers. Winnebago Industries objected as a large final-stage manufacturer of motor homes that did not purchase chassis from any of the big manufacturers. As a result, it would need at least three years lead time to comply with the standard. Even if Winnebago did purchase chassis from the big manufacturers, it feared that the big manufacturers would limit the chassis envelope sufficiently that Winnebago would face the certification costs on its own. Letter from Winnebago Industries, Docket No. 78-16-NO4-006 (July 1985). General Motors, as a large manufacturer of chassis, bolstered Winnebago's last claim. It told the Administration that it would be forced to limit the envelope for its chassis.
 
 
 36
 General Motors does not currently impose weight or center of gravity restrictions to assure/preserve compliance with [the steering column displacement standard]. While we have not conducted all of the analysis which would be needed to reach a final conclusion, it is General Motors view that the rule change will probably result in some new restrictions being imposed by General Motors for some models....
 
 
 37
 Letter from General Motors Corp., Docket No. 78-16-NO4-007, at 2 (July 1985). This response from the big manufacturers, not unexpected, alerted the Administration to the possible certification problems facing final-stage manufacturers. The original decision to limit the applicability of the steering column standard stemmed from such certification problems.
 
 
 38
 In response to these comments, the Administration provided a longer examination of the impact of the proposed amendment on final stage manufacturers in its Final Regulatory Evaluation, Docket No. 78-16-NO6-001 (Nov.1987). While the Administration allows that "some final stage manufacturers would have to certify the vehicles themselves or purchase a heavier chassis," it asserts in this final evaluation that, with the 5,500 pound weight limitation, "most final stage manufacturers utilizing pickup truck cab-chassis ... will be exempt from the standard." Id. at 16. For chassis-cabs, the Administration admits later in the evaluation that "[w]hether those vehicles that are not finished over 5,500 pounds unloaded vehicle weight might have problems with the manufacturers' pass-through certification limits on weight and center-of-gravity is not known." Id. at 17. The evaluation also discusses van cutaway chassis and van conversions, but its comments only apply to passenger and recreational vehicles. This most complete discussion of the final-stage manufacturing industry excludes the certification problems of manufacturers using cutaway or stripped chassis, concedes that the impact on manufacturers' pass-through certification limits is unknown, and nowhere provides numbers or estimates of the impact on small businesses.
 
 
 39
 This evidence from the record reveals that the Administration did not carefully consider the compliance problem of final-stage manufacturers, despite the many attempts of initial and final-stage manufacturers to bring the problem to the Administration's attention. The Administration's responses to these attempts consist of a few sentences with no additional information or study of the issue. Because the Administration did not show its work and elaborate on how it reached its conclusions, we are left to suppose either that the statements rest on studies not made part of the record--in which case we cannot provide adequate review--or they rest on the Administration's conjecture. Neither scenario leads us to view the proposed amendment favorably.
 
 
 40
 The Regulatory Flexibility Act, 5 U.S.C. Secs. 605-612 (1988), reinforces our conclusion that the proposed amendment is impracticable and therefore unreasonable. While the Act does not permit judicial review for noncompliance with the flexibility analysis provisions, 5 U.S.C. Sec. 611 (1988), this Court has held that a great impact on small businesses in violation of the Act can weigh in our determination that a regulation is arbitrary, capricious, or contrary to law. Michigan v. Thomas, 805 F.2d 176 (6th Cir.1986). Although the agency under review in Thomas clearly abdicated its responsibility under the Regulatory Flexibility Act, id. at 187, and although the Administration has at least said that the standard would not have a great impact on small business, such a conclusory statement with no evidentiary support in the record does not prove compliance with the Regulatory Flexibility Act and therefore buttresses our conclusion that the proposed amendment is unreasonable.
 
 
 41
 In addition to being impracticable, the proposed amendment exceeds the authority granted to the Administration in the Act. While Congress intended to eliminate clear hazards from the nation's highways, it did not mean to eradicate consumer choice in the free market. The Senate Committee report on the bill that became the Act makes this clear.
 
 
 42
 In determining whether any proposed standard is "appropriate" for the particular type of motor-vehicle equipment or item of motor-vehicle equipment for which it is prescribed, the committee intends that the Secretary will consider the desirability of affording consumers continued wide range of choices in the selection of motor vehicles. Thus it is not intended that standards will be set which will eliminate or necessarily be the same for small cars or such widely accepted models as convertibles and sports cars, so long as all motor vehicles meet basic minimum standards.
 
 
 43
 S.Rep. No. 1301, supra, 1966 U.S.Code Cong. & Admin.News at 2714. The effect of the proposed amendment is to eliminate customized trucks for specialized uses. Clearly, Congress did not intend this result.
 
 
 44
 The Administration could meet the needs of final-stage manufacturers in many ways. It could exempt from the steering column displacement standard all commercial vehicles or all vehicles finished by final-stage manufacturers. It could exempt those vehicles for which a final-stage manufacturer cannot pass through the certification from the incomplete vehicle manufacturer. It could change the pass through regulations. It could reexamine the issue and prove that final-stage manufacturers can conduct engineering studies, and then provide in the regulation that such studies would be the equivalent to crash testing for compliance purposes, instead of conceding that such studies exceed the capacities of final-stage manufacturers. Placing the full burden of certification on the final-stage manufacturer is, however, unreasonable, as the Administration knows. See Rex Chainbelt, Inc. v. Volpe, 486 F.2d 757 (7th Cir.1973) (requiring final-stage manufacturer to make sole certification of vehicle unreasonable), heard after remand sub nom. Rex Chainbelt, Inc. v. Brinegar, 511 F.2d 1215 (7th Cir.1975) (per curiam) (regulations should require incomplete vehicle manufacturer to certify vehicle and cement mixer installer to certify mixer and whether it has effect on vehicle). We see no reason that the reasoning in Rex Chainbelt should apply only to chassis-cabs and not to other incomplete vehicles.
 
 IV
 
 45
 Our reasons for rejecting the proposed amendment in its present form only apply to the compliance problems that final-stage manufacturers face. This holding does not require that the whole standard no longer has force. See Ford Motor Co. v. NHTSA, 473 F.2d 1241 (6th Cir.1973) (even though part of standard rejected, rest of standard in effect). Nor could petitioners have raised claims for other parties affected by the amended standard. Automotive Parts & Accessories Ass'n v. Boyd, 407 F.2d 330, 342 (D.C.Cir.1968). Our remand order only applies to the amended standard to the extent that it applies to vehicles completed by final-stage manufacturers that cannot pass through the certification of the initial manufacturer. The amendment remains in effect for all other vehicles.
 
 
 46
 Accordingly, the petition for review is GRANTED and the rulemaking is REMANDED for further proceedings consistent with this opinion.
 
 
 47
 RALPH B. GUY, Jr., Circuit Judge, dissenting.
 
 
 48
 This petition for review of a National Highway Traffic Safety Administration (Safety Administration) rulemaking action requires us to examine the extension of an existing safety standard governing steering control rearward displacement to vehicles with a gross vehicle weight rating of 10,000 pounds or less and an unloaded weight of 4,001 to 5,500 pounds. Compare 49 C.F.R. Sec. 571.204(S4.1) (1989) (standard applicable to vehicles weighing "4,000 pounds or less") with id. Sec. 571.204(S4.2) (standard applicable to vehicles weighing "5,500 pounds or less"). Our task is to ascertain whether the Safety Administration's action conflicts with the National Traffic and Motor Vehicle Safety Act (Safety Act), 15 U.S.C. Sec. 1381, et seq. Because I believe that the safety standard extension under analysis is "practicable" within the meaning of 15 U.S.C. Secs. 1392(a) and (f)(3), I dissent from the majority's decision to remand this matter for further rulemaking proceedings.
 
 
 49
 Petitioner, National Truck Equipment Association (NTEA), characterizes as "impracticable" the extension of Safety Standard No. 204, 49 C.F.R. Sec. 571.204 (1989), to vehicles weighing 4,001 to 5,500 pounds. See 49 C.F.R. Sec. 571.204(S4.2). In Chrysler Corp. v. Department of Transportation, 515 F.2d 1053 (6th Cir.1975), we explained that "the [Safety Act] practicability requirement was designed primarily to prevent the [Safety Administration] from establishing mandatory safety standards that are economically or technologically infeasible." Id. at 1060 (collecting cases). As the majority notes, petitioner apparently concedes that the five-inch steering control rearward displacement limit of Safety Standard No. 204 cannot be viewed as impracticable. Instead, petitioner claims that the testing procedure prescribed in Safety Standard No. 204 makes compliance by final stage manufacturers of specialized vehicles "impracticable."
 
 
 50
 The Safety Administration readily acknowledges that "the overwhelming majority of final stage manufacturers do not have the engineering or financial resources to conduct dynamic [crash] testing of the vehicles they have completed[.]" 54 Fed.Reg. 24,345 (1989). However, the Safety Administration points out that compliance need not involve crash testing by final stage manufacturers. See id. Instead, final stage manufacturers may build and certify their finished products within the specifications set by the sources of their chassis, see 49 C.F.R. Secs. 567.5(c)(7)(i) & (ii) (1989), thereby avoiding all potential responsibility for certification in conformity with testing requirements. See 52 Fed.Reg. 44,897 (1987); see also 54 Fed.Reg. 24,345. Alternatively, final stage manufacturers may use either heavier or higher-rated chassis in their production processes to bypass testing under Safety Standard No. 204. See 52 Fed.Reg. 44,897; see also 54 Fed.Reg. 24,345-24,346. These options, in my view, adequately satisfy the "practicability" requirement of 15 U.S.C. Sec. 1392(a).
 
 
 51
 According to the majority, the use of a heavier or higher-rated chassis is "not a real option" because it would compel final stage manufacturers "to limit the choice of the customer, who ordinarily requests a particular type of chassis to perform a particular type of job." This argument concerning potential loss of business is unpersuasive in light of Safety Standard No. 204's nearly universal application to vehicles in the 4,001 to 5,500-pound weight range with a gross vehicle weight rating of 10,000 pounds or less. See 49 C.F.R. Sec. 571.204(S2) (excluding only "walk-in vans"). Extension of the safety standard will simply require customers to adjust their orders to meet the regulatory demands of the industry. More importantly, customer preference alone cannot justify waiving basic safety standards. Rather, market demand must be constrained and, in fact, driven by such standards. Cf. Chrysler Corp. v. Department of Transp., 472 F.2d 659, 671 (6th Cir.1972) ("The explicit purpose of the [Safety] Act ... is to enable the Federal government to impel automobile manufacturers to develop and apply new technology to the task of improving the safety design of automobiles as readily as possible." (Footnote omitted)). In sum, I disagree with the majority's conclusion that the option involving use of a heavier or higher-rated chassis "vitiates the purpose of the [Safety] Administration." The Safety Administration logically reasoned that extending Safety Standard No. 204 would encourage the production and use of safer, i.e., larger and more stable, specialty vehicles.* In a case such as this where several seemingly viable options are available to manufacturers, I am unwilling to second-guess the "practicability" determination of an agency charged with the responsibility of studying and developing safety standards through an involved fact-finding process.
 
 
 
 [1]
 Standard 204 provides:
 
 
 S4
 2 .... When a [vehicle] ... is tested under the conditions of S5 in a 30 mile per hour perpendicular impact into a fixed collision barrier, the upper end of the steering column and shaft in the vehicle shall not be displaced more than 5 inches in a horizontal rearward direction parallel to the longitudinal axis of the vehicle. The amount of displacement shall be measured relative to an undisturbed point on the vehicle and shall represent the maximum dynamic movement of the upper end of the steering column and shaft during the crash test
 
 
 S5
 Test Conditions. The requirements of S4 shall be met when the vehicle is tested in accordance with the following conditions
 
 
 S5
 1 The vehicle, including test devices and instrumentation, is loaded to its unloaded vehicle weight
 
 
 S5
 2 Adjustable steering controls are adjusted so that a tilting steering wheel hub is at the geometric center of the locus it describes when it is moved through its full range of driving positions. A telescoping steering control is set at the adjustment position midway between the forwardmost and rearwardmost position
 
 
 S5
 3 Convertibles and open-body type vehicles have the top, if any, in place in the closed passenger compartment configuration
 
 
 S5
 4 Doors are fully closed and latched but not locked
 
 
 S5
 5 The fuel tank is filled to any level from 90 to 95 percent of capacity
 
 
 S5
 6 The parking brake is disengaged and the transmission is in neutral
 
 
 S5
 7 Tires are inflated to the vehicle manufacturer's specifications
 
 
 [49]
 C.F.R. Sec. 571.204 (1989)
 
 
 [2]
 [A]ny person who will be adversely affected by [an] order [of the Administration] when it is effective may at any time prior to the sixtieth day after such order is issued file a petition with the United States court of appeals for the circuit wherein such person resides or has his principal place of business, for a judicial review of such order
 15 U.S.C. Sec. 1394(a)(1) (1988).
 
 
 [3]
 "The Secretary shall establish by order appropriate Federal motor vehicle safety standards. Each such Federal motor vehicle safety standard shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms." 15 U.S.C. Sec. 1392(a) (1988). "In prescribing standards under this section, the Secretary shall ... consider whether any such proposed standard is reasonable, practicable and appropriate for the particular type of motor vehicle or item of motor vehicle equipment for which it is prescribed...." 15 U.S.C. Sec. 1392(f)(3) (1988)
 
 
 [4]
 See Letter from Boyertown Auto Body Works, Docket No. 78-16-NO1-55 (March 1979); Letter from Ford Motor Co., Docket No. 78-16-NO1-050 (Feb.1979); Comments of Olson Bodies, Inc., Docket No. 78-16-NO1-036 (Feb.1979); Comments of Chrysler Corp., Docket No. 78-16-NO1-034 (Feb.1979); Letter from United Parcel Service, Docket No. 78-16-NO1-033 (Feb.1979)
 
 
 *
 The Safety Administration has indicated that the extension of Safety Standard No. 204 to vehicles weighing 4,001 to 5,500 pounds "annually will reduce an estimated 12 to 23 fatalities and 146 to 275 serious injuries...." See 52 Fed.Reg. 44,897